[No. S034704. June 4, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES STEVENS, Defendant and Appellant.

**COUNSEL**

Richard I. Targow, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ronald S. Matthias, Dane R. Gillette and Seth K. Schalit, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORRIGAN, J.**—A jury convicted Charles Stevens of four first degree murders and six attempted murders.[1] A lying-in-wait special circumstance was found true as to one murder.[2] A special circumstance allegation of multiple murder, and personal firearm use allegations as to all counts, were also found true.[3] The jury set the punishment at death.

The case is before us on defendant's automatic appeal.[4] For the reasons that follow, we affirm the judgment.

## I. FACTUAL BACKGROUND

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

Defendant challenges the sufficiency of proof only as to one murder, one attempted murder, and the lying-in-wait special circumstance. Thus, we discuss the facts in summary, except as necessary. Between April 3 and July 27, 1989, defendant engaged in a series of random attacks, by shooting at people on or near Interstate 580 in Oakland. All but one of the victims were in cars when attacked. Defendant succeeded in killing Leslie Ann Noyer, Lori Anne Rochon, Laquann Sloan, and Raymond August. He attempted to kill Karen Alice Anderson, Janell Lee, Julia Peters, Paul Fenn, Upendra de Silva, and Rodney Stokes. Defendant was charged alone as to all the offenses, except Noyer's murder. As to this murder, Richard Clark was tried as a codefendant. The jury deadlocked on the murder charge against Clark, and the trial court declared a mistrial.

Defendant was apprehended near the scene of his final murder. On July 27, at 1:15 a.m., Rodney Stokes was driving home from work at 45 miles per hour on Interstate 580. Defendant, driving a white Mazda, pulled up alongside him and both vehicles slowed down. Stokes lowered his passenger window, and looked over to see if he knew the driver. Defendant motioned as though trying to get Stokes's attention, and smiled at him. Stokes had never seen defendant before, but thought perhaps he had a passenger who "was a

---

[1] Penal Code section 187, subdivision (a), former section 189, former section 664. All further undesignated statutory references are to the Penal Code.

[2] Section 190.2, former subdivision (a)(15), as enacted by initiative, November 7, 1978.

[3] Section 190.2, subdivision (a)(3); former sections 1203.06, 12022.5.

[4] California Constitution, article VI, section 11; Penal Code section 1239, subdivision (b).

friend from work getting a ride and trying to slow me down for whatever reasons." Stokes had often seen coworkers on the freeway. Just as Stokes realized there was no passenger, defendant shot at him.

Stokes lay down on the seat and turned off his headlights, losing control of the vehicle briefly. At this point he was traveling approximately 30 miles per hour. When Stokes regained control and looked up, the Mazda was in front of him. Defendant "was sitting there waiting, basically, still coasting in front of me and then [defendant] fired" twice more. Stokes was approximately three-quarters of a mile away from the 35th Avenue overpass. Defendant pulled away, and Stokes began flicking his lights on and off to attract police attention. He also sped up to catch defendant.

As he drove, Stokes saw defendant slow down and pull alongside Raymond August's car. They were the only two vehicles in front of him on the road. Stokes testified defendant "g[o]t the attention of the other driver" because both sets of brake lights came on. Stokes lost sight of the cars for a brief moment, which he characterized as "the snap of a finger." After rounding a slight turn, Stokes saw the cars again, and heard at least two gunshots. Defendant rapidly drove to the 35th Avenue off-ramp, left the freeway, and drove onto another on-ramp that entered the freeway going the opposite direction.

Stokes drove to August's car, which had crashed into a pillar under the 35th Avenue overpass. He saw August and "[a]n awful lot of blood." He looked across the freeway, saw the Mazda parked on the shoulder of the on-ramp, and called 911.

When the first police officer arrived, defendant was still parked on the on-ramp, looking "at the scene underneath the freeway." When the officer ordered him out of the vehicle, defendant appeared startled, and began to drive away. He then got out of the car with his hands in the air, walked backwards, and fled on foot toward a retaining wall. The officer grabbed defendant at the wall. As he did so, the officer heard a heavy metallic object hit the ground; it was a loaded .357 magnum Desert Eagle semiautomatic pistol. Defendant was carrying a loaded magazine and a loose bullet. Stokes subsequently arrived and identified defendant.

Defendant told police he had possessed the weapon for the last three to four months, since "[a]bout . . . March." Ballistics evidence indicated defendant's weapon was either a match to or consistent with the gun used in all of the crimes except for the attempted murder of Stokes. The piece of lead slug recovered from Stokes's vehicle was insufficient to make any comparison.

A search of defendant's room revealed a box and an operator's manual for the weapon, a canvas gun case, gun cleaning equipment, a .357 magnum cartridge and magazine, trays of bullets, and practice targets. He also had a collection of Oakland newspapers containing articles about the shootings, and an envelope with handwritten references to what appeared to be various Penal and Vehicle Code sections including those regarding murder, assault, vehicle theft, and weapons offenses.[5] Defendant's palm print was found on victim Noyer's vehicle.

During an unrecorded interview, police asked defendant what type of person would commit random shootings on a freeway. He replied the "only reason would be mental, or loneliness, some lonely mother fucker." When asked how such a person would be caught, he said, "The guy would get caught if somebody told on him or if he pulled over like I did."

## 2. *Defense Evidence*

Defendant presented evidence only as to the murder of 16-year-old Laquann Sloan, a conviction not challenged on appeal. Sloan was shot in the head as he walked down the street. Three witnesses testified about events before and after the shooting, but none witnessed the shooting itself.

Codefendant Clark testified regarding the Noyer and Rochon murders. Clark had given police various accounts of the Noyer murder. In his last statement, he claimed he had shot Noyer under duress because defendant threatened to shoot him. At trial, Clark denied being present at the murder scene, and said he made up the story using details from the police.

As to the Rochon murder, Clark testified that early on the morning of July 6, he and defendant were in a stolen car. As defendant drove, he started rocking back and forth, and said in an urgent tone, " 'Man, I got to shoot somebody.' " Defendant pulled alongside a car, but Clark asked why he was going to shoot this person. Defendant said, " 'Okay. I'm not going to shoot this guy. I'll shoot somebody white.' " Defendant subsequently pulled next to Lori Rochon's car, and rolled down his side window, telling Clark he thought Rochon was a "white dude," and fired at her. Clark's sister testified that in July 1989, Clark asked her to tell him when the news came on because defendant had shot someone on the freeway. The news report stated that the woman's name was "Lori," and she was shot on Interstate 580. When Clark saw a July 18 article about the assaults on Fenn, Peters, and de Silva, he called defendant and asked if he had done the shooting. Defendant said, " 'Man, don't say that over the phone.' "

---

[5] The references included: "245(A, 2)-10+" (punishment for assault with a firearm); "12020-20+" (prohibited weapons); "187-4" (murder) and "10851-32+" (vehicle theft).

## B. *Penalty Phase*

### 1. *Prosecution Evidence*

The parties stipulated that defendant was convicted in 1989 of three counts of felony auto theft. (Veh. Code, former § 10851.)

Randall Shumpert described an incident in June 1987. At 10:00 p.m., defendant and a passenger drove by the Bay Area Rapid Transit District station where Shumpert was standing. The passenger yelled something at Shumpert, and angry words were exchanged. Defendant drove off, but returned a few minutes later with his headlights off. Defendant leaned from the car window, shot at Shumpert, and drove away.

On November 30, 1988, Sheriff's Deputy William Borland and Sergeant Steve Wilson responded to a disturbance in the county jail mess hall. Defendant threw a carton of milk at Wilson, swore, and urged other inmates to throw objects at the officers. Defendant picked up his metal tray as though to throw that, but complied when ordered to put it down.

On March 18, 1993, Sheriff's Deputy Timothy Durbin was transporting defendant from jail to court during the guilt phase of this case. He heard defendant tell another inmate in hushed tones, "You know that fuckin' Clark is fucking me over. He snitched me off five times now. If I get the chance, I'm going to do him . . . . I'm going to kill that mother fucker, even if I did make him do some of that shit, he's trying to fuck me over."

Eight witnesses provided victim impact testimony regarding the accomplishments of their loved ones, and the effect of the murders on their own lives.

### 2. *Defense Evidence*

Psychiatrist Harry Kormos testified about defendant's childhood and the results of psychological testing. Dr. Kormos met with defendant approximately 10 times for three hours each over a period of four to five months. He concluded defendant had an unspecified personality disorder with schizoid and borderline personality traits. Dr. Kormos had diagnosed several dozen people with such a disorder, but could not recall any of them committing murder. Although defendant manifested this disorder, he suffered from no mental illness. Physical and psychological testing revealed no organic brain illness, tumors, or malformations. Defendant's mother stopped drinking about

five years before defendant was born, and defendant did not have fetal alcohol syndrome. Defendant's intelligence quotient of 80 to 90 revealed below-average intelligence, but he was not mentally retarded. Defendant was of mixed racial heritage: his mother was Native American, and his father Caucasian and Black. While defendant said "that he never had any difficulty" along these lines, Dr. Kormos nevertheless opined that "[t]his kind of racial confusion makes it even harder than it is already in our society to deal with racial issues."

Defendant was well cared for by his parents in Oakland until he was 11 or 12 years old. Defendant's mother was a devout Jehovah's Witness, and defendant was active in the church. About age 12, defendant moved with his mother and older sister to an Indian reservation. Defendant suffered several seizures, and an EEG showed abnormality. In a 1993 EEG, however, there were no abnormalities. His mother resumed drinking, stopped practicing her religion, and became both verbally and physically violent. She was charged with child abuse for beating defendant's older sister. Defendant reported that in two incidents a few days apart, he attempted suicide to get his mother's attention. There were no medical reports about the suicides, and he bore no scars, although he said he cut his wrists in the second attempt.

When defendant was 13, the family was reunited in Oakland. Defendant's mother was arrested on several occasions for drunk driving, and spent a year in jail. At one point she was committed to Highland Hospital for threatening to throw defendant out a window and kill his sister. She drank until her death in March 1986.

Defendant's brother was convicted of murder in 1978. Dr. Kormos said the brother, 17 years older than defendant, was only a distant figure to defendant, and he discerned no relevant "emotional" material in these factors.

Defendant was twice suspended for disruptive behavior in middle school. He had to repeat the ninth grade for academic reasons, but won several trophies in bike racing. He tried marijuana when he was 12, but did not use drugs. He did, however, sell cocaine in high school to get money for clothes and jewelry. He was fired from a pawnshop job for stealing a gun. He cared for his father, who was working full time, which Dr. Kormos opined demonstrated defendant was capable of altruistic action.

Dr. Kormos was not "able to come up with a clear diagnosis as to why" defendant murdered four people and attempted to kill six others. Defendant

never denied committing the capital crimes, but reported he could not remember committing most of them. He did have a patchy recollection of the August killing. Dr. Kormos opined that at some level defendant wanted to be caught. He found no indication that defendant derived pleasure or satisfaction from the killings.

Jerry Enomoto, a former Director of the Department of Corrections, testified defendant would be no more than a nuisance inmate in prison. Three deputy sheriffs testified regarding defendant's good conduct while in jail, although one noted defendant had lost a job assignment for misconduct.

## II. DISCUSSION

### A. *Pretrial*

#### *Alleged* Wheeler *Error*

Defendant brought four *Wheeler* motions asserting the prosecutor was improperly exercising his peremptory challenges to excuse African-Americans. (*People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) All four motions were denied. Here, defendant challenges only the ruling on the first motion. The trial court expressly found a prima facie case of discrimination in connection with this motion, and asked the prosecutor to state reasons for his challenges. The jury as sworn contained one Black juror and one Black alternate.

In *Wheeler, supra,* 22 Cal.3d 258, we held " 'that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in *Batson* v. *Kentucky* (1986) 476 U.S. 79, 84–89 [90 L.Ed.2d 69, 106 S.Ct. 1712] . . . the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 116 [109 Cal.Rptr.2d 31, 26 P.3d 357] (*Catlin*).) "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*Purkett v. Elem* (1995) 514 U.S. 765, 768 [131 L.Ed.2d 834, 115 S.Ct. 1769]; see *Batson*, at p. 93.)

Relying on *People v. Silva* (2001) 25 Cal.4th 345 [106 Cal.Rptr.2d 93, 21 P.3d 769], defendant asserts the prosecutor's reasons for challenging Prospective Jurors L.F., H.H., and J.C., all of whom were involved in the first *Wheeler* motion, were not supported by the record, and that the trial court erred in failing to question the prosecutor about these discrepancies. In *Silva*, we observed that a trial judge is required to make a "sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror. [Citations.] When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*Silva*, at p. 386.)

The record reveals that defendant's claim lacks merit. Regarding all three prospective jurors, the prosecutor stated, "The basis for the challenges are the same as for all of the people that I have challenged, and that is on the basis that the People didn't feel they would get a fair trial with those jurors . . . . [W]ith regard to all [three] of the jurors, I indicated in one way or another at the very least an ambivalence and the lack of commitment, at least in my mind, of their willingness to impose the death penalty. That there was a vacillation that they reflected and a situation that I felt I could not take the chance of them hanging this should we get to the point of . . . a penalty phase. . . . [I]t was not just merely the words that they spoke or what they had written on the questionnaire, but also the manner in which they responded to my questions, and specifically, their ability to carry it out, and reading not only what they said, but also how they responded physically to the question itself."

The prosecutor also noted, "the bulk of the victims in my case are in fact of Afro-American [descent], and I would like to have that represented on the jury. It is, just in my view and my experience, that I didn't feel that these people had the personal fortitude to in fact impose a death penalty verdict, if it should get there . . . I would also like to have that point of view reflected on this jury but, unfortunately, these jurors, I don't believe, have the ability, the internal fortitude to say to Mr. Stevens 'death' if we should get there."

As to Prospective Juror L.F. specifically, the prosecutor stated he "reflected an ambivalence" regarding the death penalty, while in his questionnaire "he indicated he was moderately for it. When it came down to whether or not he would vote for it if the issue were on the ballot, he said, 'I honestly don't know.' And in talking with him, he said, 'Well, I'll follow the law with regard

to whatever the Judge tells me.' And when you put it in terms that, well, the law doesn't mandate that you have to impose the death penalty, that's something that's up to you. He indicated, again, just an ambivalence in his ability and showed a lack of commitment in the ability to impose the death penalty."

Defendant asserts that Prospective Juror L.F. did not say he honestly did not know when asked if he would vote for the death penalty if an advisory measure were on the ballot. During voir dire, L.F. said he would vote "Yes," because the penalty was a "deterrent," and on his juror questionnaire, L.F. said he was "[m]oderately in favor" of the death penalty. However, when asked on the questionnaire, "If the issue of whether California should have a death penalty law was to be on the ballot in this coming election, how would you vote," he checked "Not sure," and wrote, "I honestly do not know." The record supports the prosecutor's stated reason.

Defendant also points out that L.F. said he could supply the 12th vote to make a death verdict unanimous "if it was called for." L.F. also said, "At one time I thought that way, I really . . . didn't like the death penalty. But I find I can follow—if the law says that's what it is, I can follow the law. I'd do what the law says and if it—if—if the law says this man gets the death penalty, this man doesn't, I could do that." These various responses do not undermine the prosecutor's stated reason.

As to Prospective Juror H.H., the prosecutor stated, "he kept on bouncing around, at least in terms of a certain amount of ambivalence that he reflected, always falling back, 'Can you do it?' And the answer is, 'Well, I'll take a look at all the information. I need all the information before I could make a decision.' At one level that may be understandable. At another level . . . , it appeared to be more of an ambivalence." The prosecutor also noted, "As I was talking with him, I could smell a very strong odor of alcohol on him, and he admits in his questionnaire that he is an alcoholic and that alcohol has gotten him into trouble. And I'm always concerned about someone who's drinking in the middle of the day . . . and who admits that he's got an alcohol problem and he's still drinking." H.H. admitted a conviction for driving under the influence a year and a half earlier.

Defendant asserts that the prosecutor "misrepresented" Prospective Juror H.H. "as falling back on needing all the evidence, [when he] in fact said that only in the context of affirming that he could and would vote for death if the evidence led him there."

On his questionnaire, Prospective Juror H.H. stated he was "neutral" regarding the penalty, and noted, "I feel that it is ineffective due to [the] fact . . . it can be delayed any number of times by any one convicted. Also it has not shown to be a [deterrent] for anyone committing crimes." On voir dire, he repeatedly asserted he would not make a decision without "all" the "information," "facts," or "evidence." In response to the court's question regarding whether he would be open to imposing either penalty, he said, "I'm the type of person, you know, that I cannot pass whatever type of judgment, whatever, or anything without having all the facts. I prefer to have all the facts before I make any kind of judgment on anything. If you don't have the facts, you tend to make mistakes, and I'm one who tends to try to have all the facts before me before I make any kind of decision." In response to the prosecutor's question as to whether he had thought about whether he could vote for a death penalty verdict, H.H. said, "Not really because, you know, like as I stated before, you have to take into consideration all of the information that's going to be presented, I mean, you know, you just cannot preformulate any kind of idea of what's going to happen without the information being available and being presented. I mean, you know, I'll put it like this, I'm an information junkie, that's one thing I live for is information. . . . I don't tend to pass any kind of judgment or anything like this without taking into consideration all of the information that's pertaining to what I'm trying to find out . . . ." In sum, the record supports the prosecutor's stated reasons.

Regarding Prospective Juror J.C., the prosecutor said she "was in a like situation of indicating, 'I think I could do it,' but reflecting, again, a lack of conviction in her ability to do it, which gave me a great deal of concern as to whether I could afford to take the chance." Defendant contends "this ignored her many answers affirmatively supporting her ability and willingness to impose the death penalty."

On her questionnaire, Prospective Juror J.C. stated she was "neutral" on the death penalty, and said, "I have not made up my mind on the death penalty[.] It would depend upon the extent of the crime[.] I cannot answer [until] I had all the facts." She was "[n]ot sure" how she would vote "[i]f the issue of whether California should have a death penalty law was to be on the ballot in this coming election," because "[n]ot all crime deserve[s] [the] death penalty."

On voir dire, when asked how she would vote if the death penalty were on the ballot, J.C. said, "I think I would vote for it. . . . I say it depends on the crime and—it depends. The penalty should fit the crime, depending on the

circumstances of what happened. I think at this time the way I feel right now I think I would vote for it. But I would have to wait until it actually happened before I make up my mind finally." When the prosecutor described how defendant would be executed, and then asked, "Now, could you cast that vote and sign that jury verdict form," Prospective Juror J.C. responded, "Since you put it like that, it's kind of hard. . . . It's hard, yeah." Thus, while J.C. made other statements that indicated she could vote for the death penalty, the record supports the prosecutor's statement that Prospective Juror J.C. was ambivalent.

Defendant further asserts that the prosecutor's pretext is demonstrated by comparing the voir dire answers of Prospective Jurors H.H., L.F., and J.C. with those of seated Jurors D.M., J.C., M.F., and V.W. Defendant did not perform a comparative juror analysis in the trial court, and acknowledges that we have disapproved of such comparative analysis for the first time on appeal. (*People v. Johnson* (1989) 47 Cal.3d 1194, 1220–1221 [255 Cal.Rptr. 569, 767 P.2d 1047].) To the extent *Johnson* may have been called into question by *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317], we perform a comparative juror analysis to facilitate this review. (Compare with *People v. Bell* (2007) 40 Cal.4th 582, 600–601 [54 Cal.Rptr.3d 453, 151 P.3d 292] [*Miller-El* does not require comparative juror review in a first stage *Wheeler* case, or when no prima facie case is found].) We do not hereby express an opinion that such a comparison is compelled. The record fails to demonstrate purposeful discrimination.

In comparison to Prospective Juror H.H., seated Jurors J.C., M.F., and V.W. had not suffered any prior convictions. Juror D.M. had suffered a conviction for driving under the influence approximately eight years earlier. However, H.H. had a substantially more recent conviction, and smelled of alcohol during voir dire.

Nor do these seated jurors demonstrate such a striking similarity in ambivalence regarding the death penalty that a finding of pretext is warranted. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 271, 273 [33 Cal.Rptr.3d 397, 118 P.3d 451] (*Schmeck*).) On her questionnaire, Juror V.W. "[a]greed with the decision" to remove Chief Justice Bird. She voted for, and was moderately in favor of, the death penalty. If the issue of whether California should have a death penalty was on the ballot, she would vote for it, since "[s]ome crimes really seem to justify the penalty."

On voir dire, when asked whether she could be in the situation of ending another person's life, V.W. answered, "You know, at this point, I guess so. I really don't know." However, when in his next question the prosecutor described the execution process and asked her if she could cast the 12th vote for a death penalty verdict, Juror V.W. said, "Yes."

On her questionnaire, Juror D.M. stated, "I believe the death penalty is justified in certain cases." She was moderately in favor of the death penalty. She would vote for it if it were on the ballot because "I think there are some crimes [heinous] enough to warrant the death penalty."

On voir dire, when asked by the prosecutor whether she could envision herself voting for the death penalty in this type of case, D.M. said in part, "to me, murder is a heinous crime so that is about the only way I can answer that for you. I would think, depending on the circumstances and depending on the instructions that we've been given as to what would make that penalty phase come into effect, that I am—I would be prepared to make that vote . . . if the aggravating . . . circumstances, warranted that the death penalty be in this case, then I could vote for it if I felt that way." In response to the prosecutor's question about casting the 12th vote for a death penalty verdict, D.M. said, "If I felt it were appropriate based on what I said before, I would have to." When asked if she would give serious consideration to defendant's mitigating evidence and the penalty of life imprisonment without the possibility of parole, she said, "I think I would have to be so convinced that . . . the death penalty was the only thing that I could vote for before I voted for it. In other words, I think I would try to give every possibility to not asking for the death penalty, unless I just could not, in my own mind, think that anything less would be appropriate. . . . I would weigh every possibility of the death penalty not being the verdict, unless I felt very convinced that that was the only appropriate verdict that I would have to vote for it, so yes, I think I would keep an open mind to anything that might sway [me] in that direction." In response to defense counsel questioning, she said, "I believe that there are certain cases for which the death penalty is appropriate. I am not so sure I can say without hearing evidence that this case falls into that category." These responses indicate an appreciation that voting for a death verdict is a grave decision, not ambivalence regarding the death penalty.

Juror J.C. stated on his questionnaire, "I believe that the death penalty is needed because it gives criminals (persons) something to think about when they commit the crimes and kill somebody either by firearms or bodily harm." He was neutral on the death penalty, and not sure if he would vote for it on the ballot. "I would read the issue first and come to a conclusion before I voted on this issue. I want to [find] out the good and bad points of this issue."

On voir dire, the court asked, "could you cast a vote as a juror for either of . . . these penalties if you felt it was the appropriate penalty . . . ?" Juror J.C. answered, "Yes, sir." In response to the prosecution question regarding "[s]hould we have a death penalty in the state of California," Juror J.C. said, "Yes, we should if . . . the crime is serious enough." Unlike

*Prospective* Juror J.C., when the prosecutor described the execution process and asked, "Knowing those consequences, could you cast that twelfth vote," *Juror* J.C. answered, "I would—I believe that if in my truthful mind that everything points to the death penalty, that's the way I would go."

Juror M.F. wrote on her questionnaire, "I feel that the death penalty should be looked at on a case-by-case basis." She was neutral on the death penalty. She was not sure if she would vote for it on the ballot because "I am not entirely convinced that the death penalty deters criminals."

On voir dire, when the court asked if she could cast a vote for either penalty, M.F. said, "Yes." In response to the prosecutor's question regarding casting the 12th vote for a death penalty verdict, she said, "Yes, sir, I could."

■ In sum, nothing in these jurors' questionnaire or voir dire answers indicates such striking similarity to the challenged prospective jurors' responses that pretext is evident. Moreover, as with any situation involving alleged bias, we defer to the trial court's credibility determination. (*Batson v. Kentucky, supra,* 476 U.S. at p. 98, fn. 21; *Schmeck, supra,* 37 Cal.4th at p. 275.) The best evidence of whether a race-neutral reason should be believed is often "the demeanor of the attorney who exercises the challenge," and "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " (*Hernandez v. New York* (1991) 500 U.S. 352, 365 [114 L.Ed.2d 395, 111 S.Ct. 1859].) In addition, the prosecutor expressly stated he was basing his challenges not only on the prospective jurors' words, but their nonverbal behavior as well. The trial court could evaluate the nonverbal conduct on which the prosecutor relied. We cannot. Indeed, in denying the *Wheeler* motion, the trial court noted it was relying not only on "an analysis of the proferred reasons," but also "the court's own observations." Defendant has failed to demonstrate purposeful racial discrimination against prospective jurors.

B. *Guilt Phase*

1. *Alleged* Crawford *Error*

■ Codefendant Clark's statement to police was redacted to delete any reference to another person. Defendant contends that admission of the statement was erroneous under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). In *Crawford,* at pages 53–54, 68, and *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266, 2276], the high court held that admission of testimonial hearsay statements against a defendant violates the Sixth Amendment confrontation clause when the declarant is not, and has not previously been, subject to cross-examination.

This claim is waived. Defendant's counsel expressly stated his satisfaction with the redacted statement because there was "no reference to [defendant] directly or indirectly." He withdrew his *Aranda/Bruton*[6] objection and motion to sever based on the redacted statement.

Moreover, the claim lacks merit. *Crawford* addressed the introduction of testimonial hearsay statements against a defendant. Clark's redacted statement contained no evidence against defendant. (*Crawford, supra,* 541 U.S. at pp. 39–40, 68.) Thus, it cannot implicate the confrontation clause. (*Richardson v. Marsh* (1987) 481 U.S. 200, 211 [95 L.Ed.2d 176, 107 S.Ct. 1702]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1046–1047 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) The same redaction that "prevents *Bruton* error also serves to prevent *Crawford* error." (*United States v. Lung Fong Chen* (2d Cir. 2004) 393 F.3d 139, 150.)

Defendant further asserts that because Clark's redacted statement was admitted, Clark testified at trial. Had Clark not testified, defendant argues, the jury would not have heard incriminating evidence about defendant's involvement in the Noyer and Rochon murders, and there would have been no modus operandi regarding freeway murders. The Sixth Amendment confrontation clause does not bar hearsay statements of a witness who testifies at trial and is subject to cross-examination. (*Crawford, supra,* 541 U.S. at p. 59, fn. 9.) Here, defendant received what the confrontation clause requires: a full opportunity to confront and cross-examine Clark.

### 2. *Challenge to Denial of Section 1118.1 Motion*

Defendant contends the trial court erroneously denied his motion to dismiss the counts regarding the murder of Lori Rochon, and the attempted murder of Paul Fenn.[7] (§ 1118.1.)[8] As for Rochon's murder, defendant argues that when

---

[6] In *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], this court "adopted 'judicially declared rules of practice' for all cases in which the prosecution proposed to introduce in evidence an extrajudicial statement of one defendant that implicated a codefendant." (*People v. Fletcher* (1996) 13 Cal.4th 451, 460 [53 Cal.Rptr.2d 572, 917 P.2d 187]; see also *id.* at p. 465.) In *Bruton,* the high court held that "because jurors cannot be expected to ignore one defendant's confession that is 'powerfully incriminating' as to a second defendant when determining the latter's guilt, admission of such a confession at a joint trial generally violates the confrontation rights of the nondeclarant. (*Bruton* v. *United States* (1968) 391 U.S. 123, 126–137 [20 L.Ed.2d 476, 88 S.Ct. 1620].)" (*Fletcher,* at p. 455.)

[7] Defendant does not challenge the sufficiency of the evidence supporting his conviction for the attempted murder of Julia Peters, who was in the van with Fenn.

[8] Section 1118.1 provides in relevant part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

the motion was argued, Clark had not testified. Hence, the evidence was insufficient as to the perpetrator's identity.

■ "The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13 [36 Cal.Rptr.2d 474, 885 P.2d 887].) "The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case." (*People v. Shirley* (1982) 31 Cal.3d 18, 70 [181 Cal.Rptr. 243, 723 P.2d 1354]; see *People v. Ainsworth* (1988) 45 Cal.3d 984, 1022 [248 Cal.Rptr. 568, 755 P.2d 1017].) The question "is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination." (*Ainsworth*, at p. 1024.) The sufficiency of the evidence is tested at the point the motion is made. (§ 1118.1; *Shirley*, at pp. 70–71; see *People v. Cole* (2004) 33 Cal.4th 1158, 1213 [17 Cal.Rptr.3d 532, 95 P.3d 811].) The question is one of law, subject to independent review. (*Cole*, at p. 1213.)

The prosecution's evidence showed Rochon was shot while driving on Interstate 580 on July 6, 1989. Between April 3 and July 16, eight people, including Rochon and Fenn, were shot at within a few miles of each other on or near that freeway. Rochon was also shot during the early morning; all of the nine other assaults in this case occurred between approximately midnight and 3:00 a.m. The bullet removed from Rochon's body had polygonal markings and was fired from a Desert Eagle pistol, a fairly unusual weapon. The Desert Eagle is the only .357 magnum pistol with polygonal rifling. Before the Noyer murder on April 3, Lansing Lee, an Oakland Police Department criminalist and firearms identification expert, had never seen a .357 magnum slug with polygonal rifling. After August's murder on July 27, Lee never again saw another such slug. Defendant was arrested in possession of a Desert Eagle, and admitted having it in his possession for several months. Defendant's Desert Eagle was used to kill Noyer, Sloan, and August, and to shoot at Anderson, Lee, and de Silva. A newspaper article regarding the Rochon murder was found in defendant's bedroom. This evidence supports a prima facie case that defendant was the perpetrator.

Defendant further contends that whether considered at the time of the motion to dismiss or following the defense case, there is insufficient evidence connecting him to the attempted murder of Paul Fenn. Not so. Fenn was shot at while driving on Interstate 580 early on the morning of July 16. Copper

bullet jackets found in his van were from a Desert Eagle. Minutes after the assault on Fenn, and only several hundred yards away, de Silva was wounded by a shot from defendant's Desert Eagle. When Clark saw a newspaper article about the assaults on Fenn and de Silva, he called defendant and asked if he had done the shooting. Defendant said, " 'Man, don't say that over the phone.' " An article about the Fenn and de Silva assaults was found in defendant's bedroom. The evidence was sufficient regarding defendant's identity as Fenn's attempted murderer.

### 3. *Sufficiency of Evidence of Lying-in-wait Special Circumstance*

Defendant contends there was insufficient evidence of an adequate period of watching and waiting to support the lying-in-wait special-circumstance finding for Raymond August's murder.[9] We conclude the evidence was sufficient.

A sufficiency of evidence challenge to a special circumstance finding is reviewed under the same test applied to a conviction. (*People v. Mayfield* (1997) 14 Cal.4th 668, 790 [60 Cal.Rptr.2d 1, 928 P.2d 485].) Reviewed in the light most favorable to the judgment, the record must contain reasonable and credible evidence of solid value, "such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

The prosecution relied solely on a theory of premeditation for the underlying murder of August. The jury convicted defendant of first degree murder, and he does not challenge that conclusion. Evidence of lying in wait was provided primarily by Rodney Stokes, at whom defendant shot just before murdering August. (See, *ante*, at pp. 187–188.)

At the time of the capital crimes, the elements of the lying-in-wait special circumstance required an intentional killing, committed under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage.[10] (§ 190.2, former subd. (a)(15); *People v.*

---

[9] The jury found not true the lying-in-wait special-circumstance allegation regarding Noyer's murder.

[10] Here, the jury was instructed that in order to find the special circumstance true, defendant must have intentionally killed the victim and done so while lying in wait. Lying in wait was defined as "waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise even though the victim is aware of the murderer's presence. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind

*Morales* (1989) 48 Cal.3d 527, 554–555, 557 [257 Cal.Rptr. 64, 770 P.2d 244] (*Morales*).) █ The purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. (See *People v. Moon* (2005) 37 Cal.4th 1, 24 [32 Cal.Rptr.3d 894, 117 P.3d 591] (*Moon*).) This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' "[11] (*Sims, supra,* 5 Cal.4th at pp. 433–434.) " ' "The element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." ' " ' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 500 [117 Cal.Rptr.2d 45, 40 P.3d 754] (*Hillhouse*).) The factors of concealing murderous intent, and striking from a position of advantage and surprise, "are the hallmark of a murder by lying in wait." (*People v. Hardy* (1992) 2 Cal.4th 86, 164 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

Defendant here was convicted of August's premeditated murder. In order to convict him of first degree murder, the jury was instructed it had to find

equivalent to premeditation or deliberation. Thus, for a killing to be perpetrated while lying in wait, both the concealment and watchful waiting as well as the killing must occur during the same time period, or in an uninterrupted attack commencing no later than the moment concealment ends. If there is a clear interruption separating the period of lying in wait from the period during which the killing takes place, so that there is neither an immediate killing nor a continuous flow of the uninterrupted lethal events, the special circumstance is not proved. A mere concealment of purpose is not sufficient to meet the requirement of concealment set forth in this special circumstance. However, when a defendant intentionally murders another person, under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, the special circumstance of murder while lying in wait has been established."

[11] Contrary to Justice Kennard's concurring and dissenting opinion, nothing in the language of section 190.2, former subdivision (a)(15), which provides that "[t]he defendant intentionally killed the victim while lying in wait," indicates that the durational element of "lying in wait" is defined differently for the special circumstance than it is for first degree murder. (Conc. & dis. opn. of Kennard, J., *post,* at p. 215.) Nor does anything we said in *Morales, supra,* 48 Cal.3d 527, indicate we were so interpreting the special circumstance. (Conc. & dis. opn. of Kennard, J., *post,* at p. 215.) At the time of the capital crimes, the only differences between lying-in-wait murder and the special circumstance did not touch on the durational element of lying in wait. Rather, first degree murder by lying in wait does not require an intent to kill, while the special circumstance based on that theory does. (*People v. Webster* (1991) 54 Cal.3d 411, 448 [285 Cal.Rptr. 31, 814 P.2d 1273] (*Webster*); *People v. Ceja* (1993) 4 Cal.4th 1134, 1140, fn. 2 [17 Cal.Rptr.2d 375, 847 P.2d 55] (*Ceja*).) In addition, the first degree murder formulation refers to "by means of" lying in wait and the special circumstance referred to "while" lying in wait. Neither difference changes the principle that for a murder conviction and for a special circumstance finding the lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation. (*Ceja,* at p. 1139; *People v. Sims* (1993) 5 Cal.4th 405, 433–434 [20 Cal.Rptr.2d 537, 853 P.2d 992] (*Sims*).)

beyond a reasonable doubt that defendant's intentional killing was willful, deliberate and premeditated.

 The facts of this case and the jury's conclusion that defendant acted with deliberation and premeditation dispel any inference that he killed as a result of rash impulse. Even a short period of watching and waiting can negate such an inference. (*Moon, supra,* 37 Cal.4th at p. 24.) The facts here are more than sufficient to establish that after the assault on Stokes, defendant turned his attention to a new target. He selected August, the driver of the only other nearby car on the road ahead of him, as his next victim. He approached and concealed his deadly purpose by pulling up alongside of August and induced him to slow down. August did so, just as Stokes had. This process may not have taken an extended period, because defendant did not have to wait long until his next target became available. But there is no indication of rash impulse. To the contrary, it was reasonable for the jury to conclude that defendant acted to implement his plan of luring a victim of opportunity into a vulnerable position by creating or exploiting a false sense of security. The jury could also reasonably conclude that August was taken by surprise. He did not flee, but slowed down and drove side-by-side with defendant, just as Stokes had done. Once the intended victim slowed down, the time to act became opportune. Defendant stopped watching and started shooting. Such behavior is completely consistent with, and provides substantial evidence for, the watching and waiting element of the lying-in-wait special circumstance.

### 4. *Alleged Unconstitutionality of Lying-in-wait Special-circumstance Instruction*

 Defendant contends the lying-in-wait special-circumstance instruction was confusing and constitutionally flawed in violation of the Sixth and Fourteenth Amendments of the United States Constitution, and California Constitution article I, section 16.[12] In particular, he contends that "[i]f the temporal element is . . . equivalent to that of first-degree murder, then the statute loses all claim to performing a rational narrowing function." It is not clear whether he means first degree murder on a theory of premeditation and deliberation, or lying in wait, but in either case the claim fails. In distinction with premeditated first degree murder, the lying-in-wait special circumstance requires a physical concealment or concealment of purpose and a surprise attack on an unsuspecting victim from a position of advantage. (§ 190.2, former subd. (a)(15); *Morales, supra,* 48 Cal.3d at pp. 554–555, 557.) Thus, any overlap between the premeditation element of first degree murder and the

---

[12] While defendant states he is challenging the instructions "as applied in this case," the entire challenge is to the language of the instruction.

durational element of the lying-in-wait special circumstance does not undermine the narrowing function of the special circumstance. (*Sims, supra,* 5 Cal.4th at p. 434.) Moreover, contrary to Justice Moreno's concurring and dissenting opinion, concealment of purpose inhibits detection, defeats self-defense, and may betray at least some level of trust, making it more blameworthy than premeditated murder that does not involve surprise. (See *Catlin, supra,* 26 Cal.4th at p. 159 [poison murder]; conc. & dis. opn. of Moreno, J., *post,* at p. 224.)

A similar narrowing distinction is discernible between the lying-in-wait special circumstance and lying-in-wait murder because the former requires an intent to kill, while the latter does not. (*Ceja, supra,* 4 Cal.4th at p. 1140, fn. 2; *Webster, supra,* 54 Cal.3d at p. 448.) Thus, any overlap between the elements of lying in wait in both contexts does not undermine the narrowing function of the special circumstance. (See *Sims, supra,* 5 Cal.4th at p. 434; see also *Catlin, supra,* 26 Cal.4th at pp. 158–159.)

Defendant further contends that "[i]f the temporal element is . . . equivalent to that of first degree murder," the "requirement of a 'substantial period of watching and waiting' is a confusing, contradictory and unnecessary addition to the instruction," making the instruction "incorrect on a material point," and results in the concept of lying in wait being defined in the instruction in materially different ways. We disagree with these assertions, and conclude the instruction is internally consistent. The instruction requires a period of time long enough to show a "state of mind equivalent to premeditation or deliberation." (See, *ante,* at pp. 201–202, fn. 10.) This formulation describes the durational requirement of the special circumstance, which is demonstrated by a substantial period of watching and waiting during which the defendant is physically concealed or conceals his purpose.

### 5. *Alleged Prosecutorial Misconduct*

Defendant alleges the prosecutor committed misconduct when he tried to prevent the jury from returning second degree murder convictions. During voir dire, the trial court explained that the jury would only reach a penalty phase if it found that defendant was guilty of first degree murder and that a special circumstance was true. Prospective jurors were also told that while deliberating in the guilt phase, they could not consider or discuss the subject of punishment in any way.

In his rebuttal argument, the prosecutor addressed defense counsel's contention that the August murder was no more than second degree. After discussing the relevant legal principles, and the evidence showing that defendant premeditated and deliberated, the prosecutor said, "Now, why go

through all of this? The court is going to instruct you you're not to consider penalty in this phase of the trial. I mean, in the back of your heads you all know if we do certain things, we might be talking about whether he should live or die, and you're not supposed to consider that in deciding whether he's guilty of any of these crimes. In any of the special circumstance clauses, you're supposed to separate that and you all said you could do it. And while you're not supposed to consider penalty and punishment, [defense counsel] and [defendant] certainly are thinking about it. And what happens when you say these are all murders? No doubt about it. All of the attempted murders, they're all attempted murders, no doubt about it. Yeah, but they're only second degree murders. What happens if they're second degree murders? You can never find him guilty of the special circumstance. And they save his life or at least save—"

Following defense counsel's objection, the trial court said, "Ladies and gentlemen, as I've indicated to you previously, the statements of the attorneys and argument are not evidence as you know with regard to the law. At the conclusion of the arguments I will be instructing you as to the law that is applicable to this case. With regard to the last comment, I will direct you to disregard it." The jury was subsequently instructed not to consider penalty or punishment in its deliberations.

There is no reasonable likelihood the remark misled the jury as to whether it could consider punishment in its guilt deliberations. (*People v. Samayoa* (1997) 15 Cal.4th 795, 842–843 [64 Cal.Rptr.2d 400, 938 P.2d 2] (*Samayoa*).) As the high court has stated, "arguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." (*Boyde v. California* (1990) 494 U.S. 370, 384 [108 L.Ed.2d 316, 110 S.Ct. 1190] (*Boyde*).)

Moreover, while defendant relies on *People v. Holt* (1984) 37 Cal.3d 436 [208 Cal.Rptr. 547, 690 P.2d 1207] (*Holt*), to assert the reference to punishment was prejudicial, *Holt* is distinguishable. There, the trial court did not immediately admonish the jury following the prosecutor's remark that accepting defendant's theory would guarantee Holt a parole date. (*Id.* at pp. 457–458.) Rather than disapproving the argument, it said, " 'I wouldn't talk any more about that.' " (*Id.* at p. 458.) Here, in addition to the court's immediate intervention and disapproval, the jury had already been properly informed that a penalty phase would follow only if defendant was convicted of first degree murder and a special circumstance was found true. Nothing in *Holt* indicates that the jury there had been similarly informed. Moreover, the

*Holt* court did not find prejudice based solely on the prosecutor's argument. Rather, it reversed for cumulative prejudice based on several errors including the objectionable argument. (*Id.* at pp. 458–459.)

In addition to these factors which distinguish this case from *Holt*, after argument the jury here was instructed, as was the jury in *Holt*, " 'In your deliberations the subject of penalty or punishment is not to be discussed or considered by you. That is a matter which must not in any way affect your verdict or affect your finding as to the special circumstance[s] charged in this case.' " (*Holt, supra,* 37 Cal.3d at p. 458, fn. 16.) We presume the jury followed that instruction. (See, e.g., *People v. Ledesma* (2006) 39 Cal.4th 641, 684 [47 Cal.Rptr.3d 326, 140 P.3d 657].)

### C. Penalty Phase

#### 1. Alleged Prosecutorial Misconduct

Defendant also alleges numerous instances of prosecutorial misconduct at the penalty phase. There was no prejudicial misconduct either as to individual claims or collectively.

First, defendant contends the prosecutor ignored the trial court's ruling on the scope of victim impact evidence. The trial court directed that August's girlfriend, Linda Leach, not mention "feelings of personal guilt."

Defendant objects to Leach's testimony in response to the prosecutor's question "When did you last see him?" Leach said she and August saw each other every day. She had a company function on the night August was murdered, and he had not felt comfortable leaving without knowing Linda arrived home safely. These statements do not violate the trial court's order, and certainly the prosecutor's question would not be expected to elicit inappropriate testimony.

The trial court sustained objections to and struck Leach's volunteered testimony that "I still feel a lot of guilt about the fact that he was leaving my house" and "we should have followed the news stories. We should have known that he should not have been on the road." We need not consider the correctness of the trial court's ruling regarding reference to feelings of personal guilt. Neither of Leach's statements were elicited by the prosecutor, and the jury was told to disregard them.

Defendant asserts without elaboration that "[a] similar pattern occurred with Laquann Sloan's mother," and defense counsel was "forced to object

repeatedly . . . . , as he was again with Lori Rochon's sister, Karen Adams . . . ." We have examined the questioning of these witnesses, and see no misconduct.

Next, defendant asserts prosecutorial misconduct when Leslie Noyer's mother picked up and kissed a photograph of her daughter as she left the witness stand. Defendant moved for a mistrial. The prosecutor said that the incident "was totally, from my perspective, spontaneous. It was something that I did not anticipate occurring at all. . . . [T]he act of the kissing of the photograph was something that took us all by surprise." Defense counsel said, "He knows or didn't know. I would assume he didn't know it was going to happen. . . . I don't think that's an issue . . . I'm not alleging any kind of misconduct."

The court denied the motion. It found that counsel had acted in good faith. It noted that the photograph "was in a position that was out of the line of sight of the witness as she was being examined by [the prosecutor], and it's a location in the structure of this courtroom where exhibits throughout the course of this trial over the many weeks have been placed when they have not been utilized by a particular witness."

■ By expressly asserting below he was not alleging "any kind of misconduct," defendant clearly has waived any challenge on appeal. Moreover, no misconduct is demonstrated. Nor, to the extent defendant asserts the claim, did the trial court err in denying the mistrial motion. The case law is clear that victim-impact testimony is relevant and admissible. When family and friends of murder victims are asked to come into court to testify about their bereavement, the situation is an emotionally charged one. The mother's grief at losing her daughter was a normal human emotion the jury would assume she experienced. Kissing her daughter's photograph, while not appropriate, gave the jury no new or impermissible information, and was not so inflammatory it would "divert the jury's attention from its proper role" or invite a purely irrational response. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1172 [113 Cal.Rptr.2d 827, 34 P.3d 937].)

Next, defendant contends the prosecutor tried to undermine the trial court's ruling regarding what the prosecution asserted was defendant's "scorecard." The court admitted an envelope with handwritten references apparently to Penal Code and Vehicle Code sections, with numbers next to these sections. (See, *ante*, at p. 189.) The court excluded a notation on the envelope to "190 Ø." The prosecution's theory was that this was a reference to section 190, delineating punishment for murder, and in his view indicated a plan to kill a police officer.

During his cross-examination of Dr. Kormos regarding the envelope, the prosecutor said, "Let's assume if there is another element on that score card . . . that indicated an intent to murder a police officer—" The court sustained defense counsel's objection, and subsequently stated, "There's been no answer to the question. The question is to go out. The jury is to disregard it."

Even assuming the prosecutor's question was improper, there is no reasonable likelihood it misled the jury as to evidence of defendant's intent to murder a police officer. (*Samayoa, supra,* 15 Cal.4th at pp. 842–843.) No evidence of such a plan or attempt was introduced. Indeed, the prosecutor never finished the question, so the jury had no idea what point he was trying to make. In addition, the jury was promptly reminded the question had not been answered, and they were to disregard it. For these reasons, and to the extent defendant raises the claim, the trial court did not err in denying his subsequent motion for mistrial based on this aborted and stricken question.

Next, defendant contends the prosecutor engaged in several instances of misconduct during closing argument. The prosecutor said, "The difficulty in this case is not whether the death penalty is justified and warranted here. The difficulty is whether all 12 of you have the internal fortitude to impose the death penalty on that man over there. It's not easy. It's not easy. And as [defense counsel] in his opening statement alluded to, all it takes is one, one of you to block a death verdict in this jury. And that's what he wants, just one of you, because we have to have a unanimous verdict for a death verdict. All 12 of you have to agree on that. And if you don't and you hang, we do it again with another jury." Defense counsel objected, and the jury was told to disregard "the last comment."

While defendant notes he objected to and brought an unsuccessful mistrial motion regarding the last comment, he challenges on appeal only the "internal fortitude" aspect of the prosecutor's statement. This claim is forfeited because defendant did not object on this ground at trial. It is also meritless.

Relying on *United States v. Young* (1985) 470 U.S. 1, 18 [84 L.Ed.2d 1, 105 S.Ct. 1038], defendant contends that statements regarding the jury's "internal fortitude" were improper. *Young* involved the guilt, not penalty, phase of a criminal trial. (*Id.* at pp. 3–6.) Moreover, the high court found that, in context, the prosecutor's comment that the jury " 'do its job,' " while misconduct, did not influence the jury "to stray from its responsibility to be fair and unbiased." (*Id.* at p. 18, fn. omitted.) Here, the prosecutor's argument merely acknowledged the inherent difficulty in sentencing to death a person sitting in front of the jury. The argument was proper. (*People v. Jones* (1997) 15 Cal.4th 119, 185 [61 Cal.Rptr.2d 386, 931 P.2d 960].)

Without further elaboration, defendant next contends the prosecutor "went too far" when he said, "When we talk about this personality disorder, what is the one thing we know we can say for sure? Just the testimony and the work of Dr. Kormos tallies up to $14,250. And what do you get for your money? Nothing. Nothing. Not one ounce of it explains why he's where he is today. Not one piece of it gives you anything about his character or his background that causes you any sympathy, to lend out any compassion to give a grant of mercy and spare his life. $14,250, and that's just Dr. Kormos. What have the other doctors cost? Gretchen White? We know that she saw him a number of times. Dr. Kaufman and Shonkoff, they saw him in April of 1991, saw him three times. What do they cost?" Defense counsel objected, and the court told the jury it would be instructing it as to the law at the conclusion of argument.

Shortly after the challenged comment, the prosecutor said without objection, "the significance of the amount of money involved here illustrates that when the man's life is on the line, we are not going to be stingy, we'll give them those resources. See if you can find something. We'll give them to you. You need some bucks, $14,000 for Dr. Kormos? Fine, go ahead. You need some tests done? Fine, go ahead. We are not going to deny somebody a test that might provide something that might cause sympathy, compassion for him. But when all is said and done, it still comes up to a big zero." In context, the comment simply reflects permissible argument that, despite being given significant resources, defendant's psychiatric consultants were unable to marshal any credible reason to explain or mitigate defendant's murderous behavior. Moreover, the trial court's later instructions made clear what factors the jury could consider.

Defendant contends the prosecutor committed misconduct when he said, "Now, who haven't you heard from? Who are some people that you would have expected to have heard from that you haven't heard from? [Defense counsel], in his opening statement to you, said the defendant doesn't have any family. He's an orphan. He doesn't have anyone to speak for him. Well, that's not correct. We know that his father died last summer. We know that. But you know, . . . there are ways of preserving the testimony of witnesses who are ill, and who are elderly. You videotape their testimony and present it here. The defendant's father could have spoken to you." Defense counsel objected, stating in part, "Counsel knows I made a motion trying to do that and he was not in any condition to do that." The prosecutor responded, "Well, I disagree with that. And counsel says he doesn't like to speak, but that's a total lie." The trial court instructed the jury to disregard the prosecutor's last comment, and said, "I've told you repeatedly that with regard to the arguments of counsel, the arguments of counsel are not evidence in this case."

Defendant concedes the reasons why the examination of defendant's father "was apparently not done are not readily discernible from the record." The fact that he did not appear, and was an obvious witness to rebut the People's or corroborate defendant's penalty case, was fair comment on the evidence by the prosecutor. (*People v. Lewis* (2001) 25 Cal.4th 610, 670 [106 Cal.Rptr.2d 629, 22 P.3d 392] (*Lewis*).)

 Relying on *People v. Coddington* (2000) 23 Cal.4th 529 [97 Cal.Rptr.2d 528, 2 P.3d 1081], defendant also asserts that the prosecutor's argument was a violation of the work product privilege. *Coddington* held that a "party's decision that an expert who has been consulted should not be called to testify is within the privilege." (*Id.* at p. 606.) Whatever the continuing efficacy of *Coddington* in the context of expert witnesses (see *People v. Gray* (2005) 37 Cal.4th 168, 238 [33 Cal.Rptr.3d 451, 118 P.3d 496] (conc. opn. of Baxter, J.); *id.* at p. 238 (conc. opn. of Chin, J.)), it has long been established that a prosecutor may comment on the absence of logical witnesses to rebut the People's or corroborate the defendant's case. (*People v. Chatman* (2006) 38 Cal.4th 344, 403 [42 Cal.Rptr.3d 621, 133 P.3d 534]; *Lewis, supra*, 25 Cal.4th at p. 670; *People v. Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213]; *People v. Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959]; see *People v. Bolden* (2002) 29 Cal.4th 515, 552–553 [127 Cal.Rptr.2d 802, 58 P.3d 931].) Nor, as defendant contends, was he "sentenced to death 'on the basis of information which he had no opportunity to explain or deny.' " Indeed, defense counsel gave an explanation in his objection to the prosecutor's argument.

Defendant next objects to the prosecutor's related comment regarding defendant's sister and half sister, "And why weren't Gina and Sylvia called? Two logical inferences. One, they didn't want to testify to why—" The trial court sustained defense counsel's objection "as to the beginning of that last part." The prosecutor continued, "If they had anything positive, constructive to say to wring from you compassion and show you a basis of having sympathy and a basis for mercy to be given to this man, you would have heard it." The trial court overruled defense counsel's ensuing objection.

As to the first comment, the record does not reflect what the comment would have been. Even assuming it was inappropriate, the objection operated precisely as it was supposed to, and the jury never heard the comment. We reject defendant's assertion the second comment was misconduct for the same reasons it was not misconduct to comment on the absence of defendant's father.

Defendant asserts misconduct in the prosecutor's statement, "You know, I wonder if Dr. Kormos had the misfortune of having a loved one who violated

the law—" Defense counsel objected, and the trial court said, "All right. Move into another argument . . . ." This claim is forfeited for failure to seek an admonition. It is also meritless. Other than quoting the statement, defendant provides no reason why it was improper or how he was prejudiced. It is not even clear what the prosecutor was attempting to say. No misconduct is apparent.

Finally, defendant challenges the prosecutor's comment, "[T]his is my last chance to talk to you. And I was wondering what Leslie, Lori, Laquann, and Raymond would say to you if they had the chance to tell you what happened to them. And maybe I've been in this case too long, but I felt last night that I did have a conversation with them. And in that conversation, Leslie said to me, 'You know, his attorney—' " The trial court sustained defense counsel's objection.

The claim is waived on appeal by the failure to request an admonition. Moreover, the line of questioning was ended by defense objection, and defendant makes no attempt to explain how the partial statement was improper or prejudicial.

### 2. *Constitutionality of Death Penalty Statute*

Defendant makes numerous claims that the death statute violates the United States Constitution. We conclude they are not individually, or cumulatively, meritorious.

Section 190.2 is not impermissibly broad in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. In particular here, the multiple-murder and lying-in-wait special circumstances adequately narrow the class of murderers subject to the death penalty. (*People v. Jurado* (2006) 38 Cal.4th 72, 127 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130] (*Box*).)

Section 190.3, factor (a), which allows the jury to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1," does not violate due process and the Eighth Amendment because those circumstances differ from case to case. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *Schmeck, supra,* 37 Cal.4th at p. 304.)

The death statute does not allow for arbitrary and capricious sentencing, or deprive a defendant of the right to a jury trial on each element of a capital crime, in violation of the Sixth, Eighth, and Fourteenth Amendments. In

particular, these constitutional provisions are not violated when a jury is not required to find beyond a reasonable doubt that aggravating factors outweigh mitigating factors, that death is the appropriate sentence, or that an aggravating factor (except for other crimes) is true. (*People v. Cox* (2003) 30 Cal.4th 916, 971–972 [135 Cal.Rptr.2d 272, 70 P.3d 277] (*Cox*).)

Nor is there merit to defendant's alternative claim that a preponderance of the evidence standard of proof is compelled for the findings that an aggravating factor exists, that the aggravating factors outweigh the mitigating factors, and that death is the appropriate sentence. The jury was instructed that "[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." That instruction is sufficient. (*Tuilaepa v. California, supra,* 512 U.S. at p. 979; *Box, supra,* 23 Cal.4th at p. 1216.) "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].)

The Constitution does not require that a jury make written findings regarding aggravating factors, or reach unanimity as to which aggravating evidence is true. Nothing in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], or *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], affects our conclusions in this regard. (*People v. Prince* (2007) 40 Cal.4th 1179, 1297–1298 [57 Cal.Rptr.3d 543]; *Cox, supra,* 30 Cal.4th at pp. 971–972; *People v. Prieto* (2003) 30 Cal.4th 226, 263, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

The death statute does not violate defendant's right to due process or his state or federal right to equal protection. "[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law." (*People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614] (*Manriquez*).)

The failure to require intercase proportionality does not guarantee "arbitrary, discriminatory, or disproportionate impositions of the death penalty," or violate the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871]; *Cox, supra,* 30 Cal.4th at p. 970.) Contrary to defendant's claim, "use of unadjudicated criminal activity during the penalty phase is permissible," and does not violate the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*Box, supra,* 23 Cal.4th at p. 1217.) The trial court is not required to delineate which factors are mitigating or aggravating. (*Manriquez, supra,* 37 Cal.4th at p. 590.)

The use of the words "extreme" in section 190.3, factors (d) and (g), and "substantial" in factor (g), does not render these factors unconstitutionally vague, arbitrary, or capricious, act as a barrier to the consideration of mitigating evidence, or violate the Fifth, Sixth, Eighth, and Fourteenth Amendments. Section 190.3, factor (k), as expanded in the instructions here pursuant to *People v. Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], allowed consideration of "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (See *id.* at p. 878, fn. 10; *Schmeck, supra,* 37 Cal.4th at p. 305; *Ayers v. Belmontes* (2006) 549 U.S. 7 [166 L.Ed.2d 334, 127 S.Ct. 469, 475]; *Boyde, supra,* 494 U.S. at pp. 381–382.)

We reject defendant's argument that the death penalty statute is contrary to international norms of humanity and decency, and therefore violates the Eighth and Fourteenth Amendments. Defendant points to no authority that "prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*Hillhouse, supra,* 27 Cal.4th at p. 511.)

### III. Disposition

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**WERDEGAR, J.,** Concurring.—Like Justice Moreno, who dissents from affirmance of the lying-in-wait special-circumstance finding (conc. & dis. opn. of Moreno, J., *post*), I am concerned at the potential breadth of that special circumstance. In light of our holdings that the special circumstance (set out in Pen. Code, § 190.2, subd. (a)(15)) does not require physical concealment but only "concealment of purpose, coupled with a surprise attack from a position of advantage" (*People v. Morales* (1989) 48 Cal.3d 527, 556 [257 Cal.Rptr. 64, 770 P.2d 244]), and that the period of watchful waiting involved need be only so long " 'as to show a state of mind equivalent to premeditation or deliberation' " (*People v. Sims* (1993) 5 Cal.4th 405, 433–434 [20 Cal.Rptr.2d 537, 853 P.2d 992]), the concept of lying in wait threatens to become so expansive as to eliminate any meaningful distinction between defendants rendered eligible for the death penalty by the special circumstance and those who have "merely" committed first degree premeditated murder.

I do not believe, however, the special circumstance must or should be construed so broadly as to pose a constitutional problem. In order to find the

evidence of lying in wait sufficient in this case, particularly, we need not understand concealment of purpose to mean simply that defendant did not announce his intent before killing the victim. This case, like *Morales*, involves active *deceit* as to purpose—a misrepresentation or ruse that lulls the victim into a false sense of security. In *Morales*, one of the murderers lured the victim into his car on the pretext of a shopping trip. (*People v. Morales*, *supra*, 48 Cal.3d at p. 554; see also *People v. Sims*, *supra*, 5 Cal.4th at p. 433 [sufficient evidence to support lying-in-wait special circumstance where murderers lured pizza delivery man to motel room by pretext of ordering pizza].) In the case at bench, defendant similarly employed a ruse—gesturing and smiling as he pulled alongside the victim, Raymond August—to induce August to slow his vehicle so that defendant could shoot him. (Or so the jury could infer from the testimony of eyewitness Rodney Stokes.) Defendant's conduct was distinct from ordinary premeditated murder not merely because he did not warn the victim of his murderous intent, but because he actively concealed it by his deceitful behavior.

In my view, this is a meaningful distinction, one on which the voters could have reasonably relied in approving the special circumstance law. Those who conceal from the victim their intent to kill by deceit or ruse could reasonably be regarded as more culpable than those who do not do so; deceitful behavior is traditionally and rationally condemned. Perhaps more to the point, an aspiring murderer who lures his victim into a vulnerable position and then launches a surprise attack is particularly likely to succeed, and hence is particularly dangerous. As the penal law is meant to deter, the special circumstance is not irrational in selecting especially dangerous behavior for special punishment.

Considering defendant's employment of a ruse, moreover, sufficient evidence supports the finding that he watched and waited for his opportunity to kill August for a *substantial* period. Though he took only a few seconds to prepare to shoot August, defendant used that time, as the majority explains, "to implement his plan of luring a victim of opportunity into a vulnerable position by creating . . . a false sense of security." (Maj. opn., *ante*, at p. 203.) Brief though it was, the period of watching and waiting here was substantial in that it allowed defendant to implement a critical step in his plan of attack.

Wary as I am of affirming a finding on an overbroad lying-in-wait special circumstance, therefore, I conclude that here, without adopting an unconstitutional construction, the majority properly holds the finding supported by substantial evidence.

**KENNARD, J.,** Concurring and Dissenting.—The concurring and dissenting opinion by Justice Moreno concludes that the lying-in-wait special circumstance, as this court has construed it, does not perform the narrowing function

required by the federal Constitution's Eighth Amendment to distinguish from other murders those killings that are so heinous as to warrant the death penalty. At one time I expressed similar concerns. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1146–1147 [17 Cal.Rptr.2d 375, 847 P.2d 55] (conc. opn. of Kennard, J.).) Since then, however, I have come to the conclusion that the lying-in-wait special circumstance does not violate the federal Constitution. (*People v. Jurado* (2006) 38 Cal.4th 72, 145–147 [41 Cal.Rptr.3d 319, 131 P.3d 400] (conc. opn. of Kennard, J.).) On this point, therefore, I disagree with Justice Moreno. But I share his view that the trial court in this case erred in instructing the jury that to find true the special circumstance allegation of lying in wait, it need only find that the lying in wait continued for the length of time necessary "to show a state of mind equivalent to premeditation or deliberation." Because that error was prejudicial, this court should vacate the lying-in-wait special circumstance found by the jury in this case.

Under California's death penalty law, murder intentionally committed by lying in wait is a special circumstance warranting the death penalty, but those who commit premeditated and deliberate murder are not subject to the death penalty unless there is also a special circumstance finding. This distinction suggests that when the voters in 1978, through the power of initiative, enacted California's death penalty law, they regarded murder by lying in wait as more heinous than premeditated murder, and they intended to define murder by lying in wait in a manner that differed significantly from premeditated murder. To give effect to that distinction, this court in *People v. Morales* (1989) 48 Cal.3d 527 [257 Cal.Rptr. 64, 770 P.2d 244], held that the lying-in-wait special circumstance requires "a *substantial* period of watching and waiting for an opportune time to act." (*Id.* at p. 557, italics added.) A murder committed after a substantial period of watchful waiting demonstrates a degree of callousness and coldbloodedness exceeding that of an "ordinary" premeditated killing, where the murderer's requisite reflection and consideration of consequences may occur in a very short time. (See *People v. Lenart* (2004) 32 Cal.4th 1107, 1127 [12 Cal.Rptr.3d 592, 88 P.3d 498] ["Premeditation and deliberation do not require much time [citation], for ' "[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' "].)

Thereafter, in *People v. Sims* (1993) 5 Cal.4th 405 [20 Cal.Rptr.2d 537, 853 P.2d 992], this court upheld a jury instruction stating that the waiting period required for the lying-in-wait special circumstance " 'need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " (*Id.* at pp. 433–434.) As Justice Moreno's concurring and dissenting opinion in this case points out, *Sims* undercuts this court's earlier requirement in *People v. Morales, supra*, 48 Cal.3d at page 557, that the period of watchful waiting be "substantial." (Conc. & dis. opn. of Moreno, J., *post*, at pp. 219–220.)

In *Sims*, I wrote separately, disagreeing with the majority's discussion of three issues unrelated to lying in wait, a topic that my separate opinion in *Sims* did not address. (*People v. Sims*, *supra*, 5 Cal.4th at pp. 467–471.) On reflection, I now conclude that the *Sims* majority was also wrong in departing from this court's earlier holding in *People v. Morales*, *supra*, 48 Cal.3d at page 557, that the lying-in-wait special circumstance requires a "substantial" period of watchful waiting. I therefore agree with Justice Moreno (conc. & dis. opn. of Moreno, J., *post*, at pp. 224–225) that the trial court here erred by giving the same jury instruction that this court upheld in *Sims*: that to find the lying-in-wait special circumstance true, the jury need only find that the defendant waited for a period of time sufficient to show "a state of mind equivalent to premeditation or deliberation." I hasten to add that the giving of that jury instruction in this case was understandable in light of its express approval by the majority in *Sims*. For the reasons given by Justice Moreno (conc. & dis. opn. of Moreno, J., *post*, at pp. 225–226), the error requires reversal of the jury's special circumstance finding of lying in wait, but it does not require reversal of the judgment of death because the jury found the existence of another special circumstance.

**MORENO, J.,** Concurring and Dissenting.—I agree that defendant Charles Stevens's death judgment should be affirmed. I would, however, reverse the lying-in-wait special circumstance because the imposition on defendant of that circumstance, as interpreted by this court and applied in this case, violates the Eighth Amendment to the United States Constitution. Unfortunately, the meaning and significance of this circumstance has not been interpreted with sufficient intellectual rigor, notwithstanding the fact that its application in a given case may mean the difference between life and death.

I.

The jury found true the lying-in-wait special circumstance in connection with the Raymond August murder. As recounted in the majority opinion, defendant, driving a white Mazda on Interstate 580 in Oakland, first pulled alongside Rodney Stokes, prompting Stokes to slow down and lower his window to see if he knew the driver. Defendant motioned as though trying to get Stokes's attention, and smiled at him. Defendant then shot at Stokes several times, but missed him. After that, Stokes saw defendant catch up to another car on the freeway and appear to essentially repeat the same modus operandi: "Stokes testified defendant 'g[o]t the attention of the other driver' because both sets of brake lights came on. Stokes lost sight of the cars for a brief moment, which he characterized as 'the snap of a finger.' After rounding a slight turn, Stokes saw the cars again, and heard at least two gunshots. Defendant rapidly drove to the 35th Avenue off-ramp, left the freeway, and drove onto another on-ramp that entered the freeway going the opposite direction." (Maj. opn., *ante*, at p. 188.)

In denying defendant's claim that there was insufficient evidence of the lying-in-wait special circumstance, the majority first clarified its conception of the requirement for proving such a crime. "At the time of the capital crimes, the elements of the lying-in-wait special circumstance required an intentional killing, committed under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. (§ 190.2, former subd. (a)(15);[1] *People v. Morales* (1989) 48 Cal.3d 527, 554–555, 557 [257 Cal.Rptr. 64, 770 P.2d 244] (*Morales.*) The purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. (See *People v. Moon* (2005) 37 Cal.4th 1, 24 [32 Cal.Rptr.3d 894, 117 P.3d 591] (*Moon*).)" (Maj. opn., *ante*, at pp. 201–202, fn. omitted.)

Applying this definition of the lying-in-wait special circumstance to the present case, the majority states: "The facts of this case and the jury's conclusion that defendant acted with deliberation and premeditation dispel any inference that he killed as a result of rash impulse. Even a short period of watching and waiting can negate such an inference. (*Moon, supra*, 37 Cal.4th at p. 24).) The facts here are more than sufficient to establish that after the assault on Stokes, defendant turned his attention to a new target. He selected August, the driver of the only other nearby car on the road ahead of him, as his next victim. He approached and concealed his deadly purpose by pulling up alongside of August and induced him to slow down. August did so, just as Stokes had. This process may not have taken an extended period, because defendant did not have to wait long until his next target became available. But there is no indication of rash impulse. To the contrary, it was reasonable for the jury to conclude that defendant acted to implement his plan of luring a victim of opportunity into a vulnerable position by creating or exploiting a false sense of security. The jury could also reasonably conclude that August was taken by surprise. He did not flee, but slowed down and drove side-by-side with defendant, just as Stokes had done. Once the intended victim slowed down, the time to act became opportune. Defendant stopped watching and started shooting. Such behavior is completely consistent with, and provides substantial evidence for, the watching and waiting element of the lying-in-wait special circumstance." (Maj. opn., *ante*, at p. 203.)

II.

Lying in wait, as a principle in criminal law, began as a 14th-century statute denying to the Crown the right to pardon any person who killed

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

"while lying in wait" for his victim. This statute apparently arose as a reaction by the Norman conquerors of England against the subjugated Anglo-Saxons' practice of killing the Normans by ambush. (Note, *Criminal Law: Homicide: Murder Committed by Lying in Wait* (1954) 42 Cal. L.Rev. 337.) It evolved into a form of first degree murder, incorporated into section 189, and, as explained below, was used as an alternative means of proving that the defendant premeditated or deliberated before the murder. (Note, *supra*, at pp. 340–341; see *People v. Thomas* (1953) 41 Cal.2d 470, 481 [261 P.2d 1] (conc. opn. of Traynor, J.).)

Lying in wait took on a different use when it was incorporated as a special circumstance into the 1978 death penalty statute together with other forms of first degree murder in existence at the time, such as murder by torture or by a destructive device. This death penalty statute provided that a defendant must be sentenced to death or life imprisonment without possibility of parole if the "defendant intentionally killed the victim while lying in wait." (§ 190.2, former subd. (a)(15), as added by Prop. 7, approved by voters, Gen. Elec. (Nov. 7, 1978).) "In this setting, lying in wait is not a means of proving premeditation in order to show the murder is one of the first degree. To the contrary, the murder must already have been found to be first degree before the jury reaches the question of special circumstance. [¶] Instead, the special circumstance of lying in wait serves—and to be constitutional, must serve—a different purpose: it must provide a ' " 'meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " ' (*Godfrey v. Georgia* (1980) 446 U.S. 420, 427 [64 L.Ed.2d 398, 100 S.Ct. 1759].)" (*People v. Webster* (1991) 54 Cal.3d 411, 465 [285 Cal.Rptr. 31, 814 P.2d 1273] (conc. & dis. opn. of Broussard, J.).)

This court has failed to interpret the lying-in-wait special circumstance to serve that narrowing function. In *People v. Morales, supra*, 48 Cal.3d 527, 555 (*Morales*), we made clear that lying in wait within the meaning of the special circumstance statute did not require actual physical concealment, but only concealment of purpose. At the same time, the *Morales* court rejected a constitutional challenge to this interpretation of the lying-in-wait special-circumstance statute. "[W]e do not mean to suggest that a mere concealment of purpose is sufficient to establish lying in wait—many 'routine' murders are accomplished by such means, and the constitutional considerations raised by defendant might well prevent treating the commission of such murders as a special circumstance justifying the death penalty. But we believe that an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, presents a factual matrix sufficiently distinct from 'ordinary' premeditated murder to justify treating it as a special circumstance." (*Morales, supra*, 48 Cal.3d at p. 557.)

Although the court acknowledged that concealment of purpose alone would not distinguish lying-in-wait murder from ordinary murder, it quickly became clear that the second requirement of the lying-in-wait special circumstance, the substantial period of watching and waiting, also did not distinguish it from "ordinary" premeditated murder. We subsequently approved the lying-in-wait special-circumstance instruction that included the following, taken from the lying-in-wait murder instruction: " 'The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation. . . .' " (*People v. Sims* (1993) 5 Cal.4th 405, 433–434 [20 Cal.Rptr.2d 537, 853 P.2d 992].) As the majority affirms in the present case, "[t]he purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse." (Maj. opn., *ante*, at p. 202.)

This dictum that the lying-in-wait period be equivalent to premeditation and deliberation apparently entered the jury instruction on lying-in-wait murder via Justice Traynor's concurring opinion in *People v. Thomas*, *supra*, 41 Cal.2d 470, 475. Justice Traynor viewed as erroneous the then current lying-in-wait murder instruction, which stated that " 'Where the killing is by "lying in wait", and the act causing death was intentional, it is murder of the first degree, whether the killing was intentional or unintentional, as in such case it is not necessary that there exist in the mind of the perpetrator an intent to kill.' " (*Id.*, at p. 476.) His concern was that a jury receiving the above instruction could convict someone who had unintentionally killed a person after a period of lying in wait, even though the person's actions would not rise to the level of murder, as in the case of the person who lies in wait merely intending to surprise a person who then has a heart attack. (*Thomas*, *supra*, 41 Cal.2d at pp. 478–479.) Because section 189 provides that first degree murder will be found for murder perpetuated by various means, including lying in wait " 'or any *other* kind of willful, deliberate, and premeditated killing' " (41 Cal.2d at p. 477), Justice Traynor concluded: "There must . . . be substantial evidence of a long enough period of waiting and watching in concealment to show a state of mind equivalent to premeditation and deliberation before the court can properly give an instruction on lying in wait. . . . Otherwise a killing that was the result of a rash impulse would be converted into first degree murder." (*Id.* at p. 481 (conc. opn. of Traynor, J.).)

Thus, the language in the lying-in-wait special-circumstance jury instruction equating the period of lying in wait with a period of premeditation and deliberation was designed to ensure that the person lying in wait was guilty of murder. *Morales*'s dictum that there must be a "substantial period of watching and waiting" was intended to differentiate lying-in-wait special-circumstance murder from " 'ordinary' " premeditated murder. (*Morales*,

*supra*, 48 Cal.3d at p. 557.) The two instructions thus pull in different directions, with the former modifying and cancelling out the latter, so that the "substantial period of watching and waiting" as interpreted in *Morales* has become no more than the watching and waiting needed to establish the premeditation and deliberation required in "ordinary" premeditated murder.[2]

What then is left of lying in wait if neither *Morales*'s factor (1), concealment of purpose, nor factor (2), a substantial period of watching and waiting, actually distinguishes lying in wait from ordinary first degree murder? The third factor is to initiate, immediately after the watching and waiting, "a surprise attack on an unsuspecting victim from a position of advantage." (*Morales, supra*, 48 Cal.3d at p. 557.) But concealing murderous intent and launching a surprise attack from a position of advantage are not two distinct factors distinguishing lying-in-wait murder, but one circumstance—almost invariably, one conceals a murderous intent in order to gain advantage over the victim. According to this court's jurisprudence, then, the lying-in-wait special circumstance, which requires neither lying nor waiting, is nothing more than *murder by surprise*, and I will refer to it as such for the duration of the discussion.

Is murder by surprise a constitutionally valid special circumstance? Since *Morales*, this court has routinely rejected the notion that the lying-in-wait special circumstance is unconstitutional, relying on cases that ultimately can be traced back to *Morales* (see, e.g., *Moon, supra*, 37 Cal.4th at p. 44), not acknowledging that *Morales*'s constitutional justification for that special circumstance is built on sand. The single most comprehensive judicial effort to constitutionally defend the lying-in-wait special circumstance is to be found in *Morales v. Woodford* (9th Cir. 2004) 388 F.3d 1159. In that case, the Ninth Circuit panel, over a vigorous dissent, upheld a facial challenge to the special circumstance. The majority opinion in that case proceeded with the following syllogism. Its major premise was that "a circumstance that makes one eligible for the death penalty must meet two requirements to satisfy the Eighth Amendment" (*id.* at p. 1174) and then quoted the United States Supreme Court in *Tuilaepa v. California* (1994) 512 U.S. 967, 972 [129 L.Ed.2d 750, 114 S.Ct. 2630] (*Tuilaepa*): " 'First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a sub-class of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.' " (*Morales*, at p. 1174.)

Next, in establishing its minor premise, the Ninth Circuit majority reasoned that lying in wait applies only to a subclass of defendants convicted of

---

[2] I note that the jury was instructed in the present case that "[t]he lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation."

murder and that it is not unconstitutionally vague. As to the former point, it stated: "To illustrate a non-lying-in-wait murder: a sadistic person who wants the victim to know what is coming, and who has no doubt of his ability to accomplish the crime, may confront the victim face to face, say 'I'm going to kill you,' and do so. Or a person intending to kill another may threaten the victim, travel armed, and when he spots his intended victim by chance, approach him and shoot him face to face. Or, not uncommonly, the loser of a bar fight may say 'I'm going to kill you,' go to his car or his home and get a gun, come back to the bar, confront the victim saying 'now I'm going to kill you,' and do so. Even under the California Supreme Court's liberal interpretations of lying in wait, these hypothetical first-degree murders would not merit the special circumstance." (*Morales v. Woodford, supra*, 388 F.3d at p. 1175.) Moreover, relying on a previous case, *Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, 907–908, the court held that the special circumstance was not unconstitutionally vague because it " 'created a thin but meaningfully distinguishable line between first degree murder lying in wait and special circumstances lying in wait.' " (*Morales v. Woodford, supra*, 388 F.3d at p. 1174.)

Having thus proceeded from major premise to minor premise, the Ninth Circuit concluded that the lying-in-wait circumstance does not violate the Eighth Amendment. (*Morales v. Woodford, supra*, 388 F.3d at p. 1176.)

I disagree with the Ninth Circuit's major premise that, in order to establish the constitutionality of a special circumstance, one need only determine that the special circumstance applies to a subclass of first degree murderers and is not unconstitutionally vague. Although the Ninth Circuit relies on *Tuilaepa, supra*, 512 U.S. 967, for this proposition, I do not understand *Tuilaepa* to have repudiated the basic tenets of the United States Supreme Court's modern Eighth Amendment jurisprudence that, as the court reiterated in the same term and the same month as *Tuilaepa*, " 'to pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must *reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.*" ' " (*Romano v. Oklahoma* (1994) 512 U.S. 1, 7 [129 L.Ed.2d 1, 114 S.Ct. 2004], italics added.) Nor was it repudiating its often quoted formulation in *Godfrey v. Georgia, supra*, 446 U.S. at page 427, that death penalty eligibility criteria must provide " ' "a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." ' "

Moreover, *Tuilaepa* did not consider the validity of any special circumstance, but rather addressed the constitutionality of California's penalty phase provisions under section 190.3. To support its dictum that an aggravating circumstance that would make a defendant eligible for death "must apply only to a sub-class of defendants convicted of murder," the *Tuilaepa* court cited *Arave v. Creech* (1993) 507 U.S. 463 [123 L.Ed.2d 188, 113 S.Ct. 1534]. *Arave* concerned a challenge to an Idaho death penalty statute that had as one of its aggravating or special circumstances that " '[b]y the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life.' " (*Id.* at p. 465.) The court stated: "When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a *principled* basis for doing so." (*Id.* at p. 474, italics added.) In considering the case at hand, the court noted that the Idaho Supreme Court had given the circumstance at issue a limiting construction, referring to a " 'cold-blooded, pitiless slayer.' " (*Id.* at p. 469.) The court concluded that the circumstance as so construed genuinely narrowed the class of first degree murderers "because some within the broad class of first-degree murderers do exhibit feeling. Some, for example, kill with anger, jealousy, revenge, or a variety of other emotions. In *Walton* [*v. Arizona* (1990) 497 U.S. 639 [111 L.Ed.2d 511, 110 S.Ct. 3047]] we held that Arizona could treat capital defendants who take pleasure in killing as more deserving of the death penalty than those who do not. Idaho similarly has identified the subclass of defendants who kill without feeling or sympathy as more deserving of death. By doing so, it has narrowed in a *meaningful* way the category of defendants upon whom capital punishment may be imposed." (*Arave v. Creech, supra,* 507 U.S. at p. 476, italics omitted and added.)

It is a truism therefore, that to be consistent with the Eighth Amendment, a special circumstance that makes a defendant eligible for the death penalty must not only narrow the class of murderers, but must do so in a principled and meaningful way to " ' "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder" ' " (*Romano v. Oklahoma, supra,* 512 U.S. at p. 7), and to identify a subclass of defendants "as more deserving of death." (*Arave v. Creech, supra,* 507 U.S. at p. 476.) Special circumstances based on moral trivialities would therefore not pass constitutional muster. A "foul language" special circumstance, for example—using foul language while committing the murder—would not survive an Eighth Amendment challenge.

Most of California's many special circumstances fulfill the function of identifying the subclass of murderers more deserving of death. When someone not only commits first degree murder, but tortures the victim (§ 190.2, subd. (a)(18)), or murders by an especially destructive device that is a danger to the general public (*id.,* subd. (a)(4)), or kills a peace officer (*id.,* subd.

(a)(7)), the moral justification for the greater penalty is clear. Not so with murder by surprise. The lying-in-wait special circumstance as interpreted by this court declares in effect: "The defendant deserves a greater punishment than the ordinary first degree murderer because not only did he commit first degree murder, but he failed to let the person know he was going to murder him before he did." How can we make sense of this kind of special circumstance? Not only is surprise a common feature of murder—since murderers usually want their killings to succeed, and victims usually don't want to be murdered—but it is not at all obvious that a murderer who does not conceal his purpose before murdering the victim is less culpable than one who does. One of the examples of murder without the lying-in-wait special circumstance furnished by the Ninth Circuit, is "a sadistic person who wants the victim to know what is coming, and who has no doubt of his ability to accomplish the crime, [and who] confront[s] the victim face to face, say[ing] 'I'm going to kill you' " (*Morales v. Woodford, supra*, 388 F.3d at p. 1175). How is this murderer less culpable and less deserving of the death penalty, by any conventional standard of morality, than someone who conceals his purpose before murdering? To put it another way, because a murderer must gain an advantage over his victim, why is it at all morally significant that he gained the advantage through surprise rather than through overpowering, or that he murders right after the surprise rather than sadistically toying with the victim? And how is the murderer who announces his intention to murder just before carrying it out against a defenseless person less culpable than one who maintains surprise?

The closest this court has come to a principled defense of lying in wait as a special circumstance is the comment in *People v. Edelbacher* (1989) 47 Cal.3d 983, 1023 [254 Cal.Rptr. 586, 766 P.2d 1], that "[m]urder committed by lying in wait has been 'anciently regarded . . . as a particularly heinous and repugnant crime.' (Note, *Murder Committed by Lying in Wait, supra*, 42 Cal. L.Rev. 337.)" The cited article, as noted above (*ante*, at p. 218), in fact explains that English law regarded lying in wait as particularly heinous because in the period following the Norman conquest in the 11th century, Anglo-Saxons would lie in wait to assassinate their Norman conquerors. Whether we still share with the medieval Normans that special repugnance for lying-in-wait murder as originally conceived—an ambush assassination that involves physical concealment and a substantial period of watching and waiting—there is nothing to indicate that ordinary murder by surprise, the lying-in-wait special circumstance as construed by this court, has been historically, or is regarded currently, as an especially heinous form of murder.[3]

---

[3] Other justifications for the lying-in-wait special circumstance were considered and rejected by Justice Broussard in his cogent concurring and dissenting opinion in *People v. Webster, supra*, 54 Cal.3d 411, 467: "In *Richards v. Superior Court* [(1983)] 146 Cal.App.3d

224

In defense of the lying-in-wait special circumstance, the majority states: "In distinction with premeditated first degree murder, the lying-in-wait special circumstance requires a physical concealment or concealment of purpose and a surprise attack on an unsuspecting victim from a position of advantage. [Citations.] Thus, any overlap between the premeditation element of first degree murder and the durational element of the lying-in-wait special circumstance does not undermine the narrowing function of the special circumstance." (Maj. opn., *ante*, at pp. 203–204.) But the majority fails to explain how premeditated murder by surprise is more deserving of the death penalty or life without possibility of parole than premeditated murder that does not involve surprise.

Because, as discussed above, lying in wait was originally conceived as a type of first degree murder and not a special circumstance, it was not particularly designed to do what the Eighth Amendment requires—provide a principled basis for determining which murderers are especially culpable and therefore eligible for the death penalty. I do not assert that the court cannot give the special circumstance a reasonable limiting construction that would survive an Eighth Amendment challenge. But it has failed to do so.

### III.

In the present case, as noted, the jury was instructed on a definition of the lying-in-wait special circumstance that " '[t]he lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " (Maj. opn., *ante*, at pp. 201–202, fn. 10.) Although the jury was also instructed that the lying in wait must constitute "a substantial period of watching and waiting for an opportune time to act," the instruction regarding the duration of the lying in wait makes it reasonable for the jury to interpret the word "substantial" to simply mean that time necessary for deliberation, as this court has done. (See maj. opn., *ante*, at p. 202, fn. 10; see also *People v.*

306, 314, footnote 5, the court speculated that '[o]ne supposes that [lying in wait] is perceived as a particularly cowardly form of murder—hence the opprobrium heaped on the western villain who killed from ambush. And in earlier, more religious times, special scorn was reserved for those who murdered victims in a fashion intended to deprive them of the opportunity for reflection and contrition. Thus, the piteous complaint of Hamlet's father that he was murdered "in the blossoms of my sin/ Unhousel'd, disappointed, unanel'd/ No reckoning made, but sent to my account/ With all my imperfections on my head . . . ." (Hamlet, act I, scene v., line 66ff.)' [¶] I do not believe the drafters and voters in 1978 included the lying-in-wait special circumstance because of a 400-year-old notion that an honorable killer allows the victim time to confess his sins, or even a 100-year-old notion that an honorable killer waits until the victim has a chance to draw first. In any case, the lying-in-wait special circumstance, as construed in *Morales*, embodied neither notion. To the contrary, *Morales* specifically rejected the contention that the special circumstance only applies if the killer ambushes the victim." I agree.

*Edwards* (1991) 54 Cal.3d 787, 823 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Because the lying-in-wait special circumstance, as set forth by this instruction, does not provide a principled basis for dividing first degree murderers eligible for the death penalty from those who are not, and is therefore not consistent with the Eighth Amendment, I would hold that the instruction is in error.

For purposes of assessing the prejudicial effect of this instructional error, I will assume that the above erroneous jury instruction could have been cured by omitting the words "The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." With this omission, the jury is at least left with the unalloyed instruction that the lying-in-wait special circumstance requires a *substantial* watching and waiting period; it would not necessarily have to equate watching and waiting with the time required to premeditate and deliberate, but the term "substantial" would connote something closer to the classic ambush situation, in which the murderer not only deliberates but, while watching and waiting, holds fast to a concealed, murderous purpose for a sustained period. The evidence does not establish beyond a reasonable doubt that the jury would have found a substantial period in the present case. (See *People v. Flood* (1998) 18 Cal.4th 470, 503–504 [76 Cal.Rptr.2d 180, 957 P.2d 869] [instructional error not reversible when the evidence at trial establishes the error harmless beyond a reasonable doubt].) The evidence showed that defendant became aware of August, and pursued him, for only a few moments, and it is not clear beyond a reasonable doubt that a properly instructed jury would have found this to be a substantial period of watching and waiting. Indeed, there is insufficient evidence in the record that defendant engaged in a substantial period of watching and waiting before murdering August.[4]

---

[4] Justice Werdegar proposes that the lying-in-wait special circumstance be interpreted to require not simply concealment of purpose but "active *deceit* . . . —a misrepresentation or ruse that lulls the victim into a false sense of security" (conc. opn. of Werdegar, J., *ante*, at p. 214), and that such limiting construction would insulate that special circumstance from a constitutional challenge. Assuming she is correct, such construction would not save the lying-in-wait finding in the present case. The jury was not instructed on active deceit, and although some parts of the instruction could lead jurors to believe that active deceit was required, the part of the instruction incorporating *Morales* makes clear that concealment of purpose alone, together with the two other factors discussed above, would suffice to find lying in wait. (See *Morales*, *supra*, 48 Cal.3d at p. 555.) Nor is it clear beyond a reasonable doubt that the jury would have found active deceit in the present case had it been instructed in that requirement. Defendant's act of pulling up alongside Stokes, and briefly motioning at and smiling at him, is hardly evidence beyond a reasonable doubt of an active deceit that is distinguishable from mere concealment of purpose. (Cf. *People v. Sims*, *supra*, 5 Cal.4th at p. 433 [lying-in-wait special circumstance found where murderers lured pizza delivery man to motel room by ordering pizza].)

I do not deny that defendant's murder of August alone—a random, callous act of killing—could under some theory be viewed as a particularly heinous murder making defendant eligible for the death penalty. But lying in wait is not what made that murder heinous. I would therefore reverse the lying-in-wait special circumstance as to the August murder, but would otherwise uphold defendant's capital sentence based on the multiple-murder special circumstance and the fact that the jury could still properly consider the aggravated circumstances of the August murder at the penalty phase of the trial. (See *Brown v. Sanders* (2006) 546 U.S. 212, 221–223 [163 L.Ed.2d 723, 126 S.Ct. 884].)