Filed 8/11/14  P. v. Ubando CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM UBANDO,<br><br>    Defendant and Appellant. | A136588<br><br>(Solano County<br>Super. Ct. No. VCR208789) |

Defendant beat his girlfriend to death after she attempted to end their relationship. In testimony, defendant admitted he bought the murder weapon early on the morning of the killing, waited for the victim in a parking lot, followed her car, and attacked her after a conversation during which she refused to reconcile.  Defendant contends the jury's finding that the killing was committed by means of lying-in-wait was not supported by the evidence, and he also raises instructional error and evidentiary issues.  We affirm the judgment.

BACKGROUND

Defendant was charged with murder in an information filed March 25, 2011. (Pen. Code, § 187, subd. (a).)[1]  The information alleged the special circumstances of murder by means of lying in wait (§ 190.2, subd. (a)(15)) and murder involving torture (§ 190.2, subd. (a)(18)).

---

[1] All further unspecified statutory references are to the Penal Code unless otherwise noted.

1

The victim, Ritchie Campued, was a coworker of defendant whose common law husband lived in the Philippines. She and defendant began a romantic relationship around the beginning of 2010. By June or July 2010, defendant had filed for divorce from his wife of 13 years, explaining to her that he was in love with Campued.

Shortly before the killing in September 2010, Campued's husband arrived for a two-week visit. Following his departure, during a telephone call late on the evening before the killing, Campued told defendant she did not want to see him anymore and "wanted to be with her husband and to be with her kids." Defendant was angered by the call. At 1:00 a.m. that morning, shortly after the call, he drove to a Walmart and purchased a metal baseball bat.[2] Defendant then drove to his wife's house, where he was allowed to fall asleep in his son's bedroom. At the time, he told his wife he was obsessed with Campued. After awakening at 6:00 a.m., defendant drove to his own home and went back to sleep, leaving the bat in the trunk of his car. Around noon, he drove to a nursing school that Campued was attending.

A statement by defendant to the police and his testimony at trial were the only direct evidence of the immediate circumstances of the killing. After arriving at the school, defendant parked "far" away from Campued's truck and the front entrance of the school and consciously avoided being seen by the owner of the school, who knew Campued's husband. He said he sat in his car for "a few hours," waiting for Campued to finish an exam she was taking.[3] During his wait, he twice texted Campued an invitation to "go eat," but she did not respond. When Campued emerged from the school and walked toward her truck, defendant began calling her on the telephone. She answered the second call after entering and starting the truck and told him she intended to get a restraining order. While still talking on the telephone, she drove from the parking lot in the direction of her home. Defendant followed in his car.

---

[2] Defendant told police he bought the bat for self-protection because his home had been burglarized three weeks earlier.

[3] Based on the chronology of events, defendant probably waited for Campued for less than two hours.

Defendant implored Campued to stop somewhere to talk in person. Although she initially resisted, saying, "[t]here's nothing to talk—we can't talk anymore," she eventually relented when defendant threatened to go to her house early the next morning. She turned off into the parking lot of a park near her home, pulling her truck into a parking space. Defendant pulled up in the space beside her, left his car, and climbed into the passenger seat of her truck.[4] The two spoke for "15 or 20 minutes" about Campued's decision to end the relationship. It was an emotional discussion, with defendant at one time pleading with her on his knees, and he eventually got "upset." At trial, defendant said his pleading focused on the restraining order, which he believed would interfere with his work, but he told police he was asking her to "give me another chance."

At some point, defendant told police, he could no longer "control my anger" and retrieved the baseball bat from the trunk of his car. At trial, he testified he initially went to his trunk to get water and saw the baseball bat, and picked it up. The discarded plastic wrap for the baseball bat was later found by police in the parking lot, suggesting defendant took time to unwrap it before proceeding. As defendant walked to the driver's side of Campued's truck, she opened the door and placed her feet on the ground, apparently in the process of leaving. Defendant first struck the open door with the bat and then hit Campued on the head.[5] She slumped to the pavement, and defendant hit her again. As she lay on the ground, Campued told defendant, "I really love you," and he responded, "[t]oo late," while beating her in what can only be described as a brutal frenzy. A medical professional testified that defendant hit Campued "a minimum" of 28

[4] An off-duty police officer happened to witness Campued's arrival, which attracted his attention because she pulled into the parking space so abruptly her tires squealed. Defendant's car followed soon after. He walked quickly to Campued's truck and got in. The officer saw nothing in his hands. Because the officer was leaving the park at the time, he was no longer present at the time of the assault.

[5] Defendant's testimony on the exact circumstances was contradictory. He testified both that Campued left the truck while he was still retrieving the bat from his trunk and that she was seated in the truck when he first struck her. He told the police that Campued was still in the truck when he first hit her. The summary in the text appears to be most consistent with the entirety of his testimony.

times around her head, neck, upper body, and buttocks, striking with such force that he tore the skin from her head, exposing her skull.  The police later found not only a large pool of blood "spread across the parking stall" near the door of her truck, but also blood on the nearby curb and grass and the impression of a face in the grass, smeared with "coagulated blood."

Campued was still alive when defendant finally stopped.  He picked her up, placed her in the passenger seat of his car, and locked the door of her truck.  He then drove around for two to three hours, speaking by cell phone with several people about the killing and, at one point, texting a picture of Campued's damaged face.  For a time, Campued's voice could be heard weakly in the background.  One of his friends suggested defendant turn himself in, but defendant said he "wasn't ready to surrender the girl."  Nonetheless, he eventually drove to the friend's house and was taken into custody without incident.  Campued's body was lying on the front seat and floor of his car, partially covered by a blanket.

At the close of the prosecution's case-in-chief, defendant moved for a judgment of acquittal on both special circumstances allegations.  The trial court granted the motion as to the torture allegation, but it denied the motion as to the allegation of lying-in-wait.[6]  The jury convicted defendant of first degree murder and found true the remaining special circumstances allegation.  Defendant was sentenced to life without the possibility of parole.

DISCUSSION

Defendant raises three claims related to the special circumstances finding of murder by lying-in-wait, as well as one claim relating to rebuttal evidence.

**A.  Evidentiary Support For Lying-In-Wait.**

Defendant contends the jury's finding that the killing was committed by means of lying-in-wait was not supported by the evidence.

---

[6] Defendant has not appealed the denial of this motion, although he does appeal from the jury's finding with respect to the lying-in-wait special circumstances allegation.

4

" '[T]he elements of the lying-in-wait special circumstance require[] an intentional killing, committed under circumstances that included a physical concealment or concealment of purpose; a substantial period of watching and waiting for an opportune time to act; and, immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. [Citations.] . . . [The period of waiting and watching] need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " [Citation.] " ' "The element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." ' " ' " ' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1183 (*Hajek and Vo*).) "As for the watching and waiting element, the purpose of this requirement 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] . . .' 'The factors of concealing murderous intent, and striking from a position of advantage and surprise, "are the hallmark of a murder by lying in wait." ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073 (*Mendoza*).)[7]

" ' "We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction. [Citation.] Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." [Citation.]' [Citation.] 'The question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the elements of the underlying enhancement beyond a reasonable doubt.' " (*Hajek and*

---

[7] *Hajek and Vo* and *Mendoza* involved the version of the special circumstance applicable prior to the passage of Proposition 18 in 2000, which changed the requirement of a killing "while" lying-in-wait to one committed "by means of" lying-in-wait. (*People v. Lewis* (2008) 43 Cal.4th 415, 512, fn. 25, disapproved on other grounds in People v. Black (2014) 58 Cal.4th 912, 919-920 (*Lewis*).) Although the Supreme Court has yet to consider the implications of this change, it appears to have removed the requirement that the surprise attack occur "immediately" after the period of watching and waiting, but otherwise to have left the elements of the special circumstance intact. (*People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297, 307–308 (*Broadway*).)

*Vo, supra,* 58 Cal.4th at p. 1197.)  " ' "We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. . . . '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.'  [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility." ' " (*Id.* at p. 1183.)

We find substantial evidence from which the jury could have found the lying-in-wait special circumstances allegation true beyond a reasonable doubt.  Based on defendant's purchase of the bat late the night before, promptly after his rejection by Campued, and its storage in the trunk of his car, the jury could have concluded defendant intended to use it as a murder weapon from the moment he bought it.  Defendant then placed himself in a position where he knew he would encounter Campued, waiting outside the school.  When she emerged, he followed her truck, eventually coercing her into pulling over and meeting with him.  He then spoke with her for some period of time, before excusing himself to get the bat.  Campued made no attempt to leave the park after defendant left the truck, even while he was pausing to unwrap the bat.  Because the bat was in his trunk, he presumably then approached Campued from behind as she sat in her truck.  Upon confronting her, he immediately disabled her with a blow to the head.

These circumstances satisfy the requirements of concealment of purpose, a substantial period of watching and waiting for an opportune time to act, and a surprise attack on an unsuspecting victim from a position of advantage.  The jury could have found a period of watching and waiting on the basis of defendant's entire course of conduct during the day of the killing, from the time of his arrival at the school to his leaving Campued's truck to open his own trunk.  Throughout, he worked to put himself in a position to assault Campued.  There is no reason to believe he revealed his murderous purpose to Campued prior to emerging with the bat, since she made no attempt to drive away, and his ability to arm himself and approach from behind before Campued became suspicious, essentially trapping her in the truck, placed him in a position of advantage.

Defendant contends there is no evidence he concealed his purpose from Campued because "his purpose was to reconcile" when speaking with her, prior to fetching the bat. The jury, of course, was not required to accept defendant's characterization of his mental state during the conversation preceding the killing and could readily have inferred that defendant formed an intent to kill prior to entering Campued's car and maintained that intent throughout their discussion, notwithstanding his pleas to reconcile. Even if defendant had been willing to abandon his plan if Campued agreed to reconcile, that willingness was not inconsistent with an intent to kill and a plan of attack. That a prospective criminal entertains the possibility of abandoning a criminal plan in the event of changed circumstances does not mean he or she lacks the intent to accomplish the plan in the absence of such change.

At bottom, defendant's argument is that the evidence required the jury to find that he did not form the intent to kill Campued until he realized she would not reconcile with him, at which point he grabbed the bat. While that is one inference that could be drawn from the evidence, the jury was by no means *required* to reach that conclusion. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 501 (*Hillhouse*).) As discussed above, there is substantial evidence from which the jury could have concluded he formed the intent to kill her much earlier.

Defendant also contends there was no evidence of a substantial period of watching and waiting after he left the school parking lot. Contrary to defendant's argument, the jury could have concluded that both his following Campued in his car and his conversation with her at the park constituted "watching and waiting" for purposes of the lying-in-wait special circumstance. "Watching and waiting" does not require a defendant to hover unseen. (*People v. Morales* (1989) 48 Cal.3d 527, 554–555 ["physical concealment from, or an actual ambush of, the victim is not a necessary element of the offense of lying-in-wait murder"], disapproved on other grounds in People v. Williams (2010) 49 Cal.4th 405, 459.) Rather, it consists of a defendant's biding time while concealing his or her purpose, waiting for an opportune moment to kill. In *People v. Livingston* (2012) 53 Cal.4th 1145, for example, the defendant waited in a bar until the

7

early hours of the morning, when his victims at a guardhouse would be relaxed and unsuspecting. (*Id.* at p. 1173.) In *Hillhouse*, the defendant watched and waited while driving the victim, passed out from intoxication, around in a truck. (*Hillhouse, supra,* 27 Cal.4th at p. 501.) In *People v. Stevens* (2007) 41 Cal.4th 182 (*Stevens*), the watching and waiting occurred while the defendant followed the victim's car on the highway and maneuvered into position beside it, allowing him to shoot into the victim's car. (*Id.* at p. 203.) Defendant's pursuit and passionate conversation with Campued were not inconsistent with watching and waiting for the right moment to kill.

Defendant relies on *Lewis*, *supra*, 43 Cal.4th 415, in which the Supreme Court found insufficient evidence to support a lying-in-wait special circumstance after the defendants carjacked individual victims and drove them around in their cars from bank to bank, forcing them to make ATM withdrawals, before finally killing them. (*Id.* at p. 514–515.) *Lewis*, however, was applying the earlier requirement that the killing occur "during" the period of lying-in-wait. (*Id.* at p. 512, fn. 25.) In reaching its conclusion that "a period of watchful waiting culminating in surprise kidnapping, a series of nonlethal events, and then a cold, calculated, inevitable, and unsurprising dispatch of each victim" is insufficient to satisfy the prior version of the special circumstance, *Lewis* explained that if those circumstances were found sufficient "it would be difficult to say that there is any distinction between a murder committed 'by means of' lying in wait and a murder committed 'while' lying in wait." (*Id.* at p. 515.) The explanation certainly suggests the court would have taken a different approach if the applicable language of the special circumstance had been the current form.[8]

Defendant finally contends there was insufficient evidence of a surprise attack from a position of advantage. As noted above, the jury could readily have inferred that, without telling Campued his purpose, defendant went into the trunk, brought out the bat,

---

[8] Defendant also contends there must have been a "causal nexus" as well as a temporal one, between the killing and the lying-in-wait, citing *People v. Wilkins* (2013) 56 Cal.4th 333, 346–347, a felony murder decision not directly applicable. Even assuming those requirements, the jury could readily have found them satisfied here.

and attacked from behind before she had a chance to escape. By arming himself without Campued's knowledge, defendant gained an advantageous position. That Campued might have realized defendant's purpose at the last moment and attempted to leave the truck as he approached her with the bat does not eliminate the element of surprise, nor does it, as defendant contends, demonstrate that he did not intend to kill by surprise. As he undoubtedly knew, Campued could have easily escaped in her truck had defendant not used surprise.

### B. The Jury Instructions.

The trial court delivered the standard Judicial Council of California Criminal Jury Instructions (CALCRIM) on these issues, CALCRIM Nos. 728 and 521. CALCRIM No. 728 instructs the jury generally on the elements of the lying-in-wait special circumstance, as discussed above. With respect to the duration of the period of watchful waiting, the focus of defendant's present argument, the court told the jury, "The lying in wait does not need to continue for any particular period of time, but its duration must be substantial and must show a state of mind equivalent to deliberation or premeditation. [¶] The defendant acted deliberately if he carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill. The defendant acted with premeditation if he intended to kill before committing the act that caused death."

CALCRIM No. 521, which explains first degree murder, includes a discussion of premeditation and deliberation as well as the definitions included in CALCRIM No. 728 and quoted above. After this portion of the instruction, the court told the jury, "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. [¶] A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

9

Defendant contends these instructions, when read together, are ambiguous because CALCRIM No. 521 states that a deliberate and premeditated decision to kill "can be reached quickly," which is inconsistent with the instruction in CALCRIM No. 728 that the period of watchful waiting must be "substantial and must show a state of mind equivalent to deliberation or premeditation."

We find no inconsistency or ambiguity. Defendant's argument that the "substantial" period of watching and waiting necessarily cannot occur "quickly" is premised on a dictionary definition of "substantial" as " 'considerable in quantity' " or otherwise signifying something large. The intended meaning here, however, is the literal one, that is, "having substance." As the Supreme Court noted in *People v. Edwards* (1991) 54 Cal.3d 787, "We have never required a certain minimum period of time, only a period not insubstantial." (*Id.* at p. 823.) The purpose of the requirement " 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse.' " (*Mendoza, supra,* 52 Cal.4th at p. 1073.) The language of the instruction is consistent with the meaning. The duration of the period of watching and waiting must be sufficient to demonstrate the gravity associated with a decision to kill with deliberation or premeditation—it must have substance. As has been repeatedly held, however, the period need not continue for any particular length of time, so long as it demonstrates deliberation or premeditation. (*Ibid.*) Accordingly, there is nothing inconsistent in the two instructions if the circumstances demonstrate a "cold, calculated decision to kill" made in a brief period of time.

*Stevens, supra,* 41 Cal.4th 182, illustrates this principle. In that case, the defendant drove up alongside a car on the highway, induced the driver to slow down, pulled out a gun, and shot at the driver. When he missed and his intended victim took evasive action, the defendant caught up to another driver and repeated the maneuver, this time with fatal success. The period of watching and waiting for the second victim was no longer than it took for the defendant to turn his attention from the first car to the next ahead. (*Id.* at p. 203.) Yet given the defendant's failed attempt just seconds before, there was little question that, in that short time, the defendant made a cold, calculated, yet

10

nearly instantaneous decision to kill the next driver ahead. Under those particular circumstances, that period of time, combined with the time necessary to maneuver alongside the victim, was sufficient to satisfy the special circumstance. (*Ibid.*) It was short but, given the gravity of the decision, substantial.

Defendant also argues the decision in *People v. Poindexter* (2006) 144 Cal.App.4th 572 (*Poindexter*), holds that the "substantial" period of watchful waiting must be longer than the time necessary for deliberation and premeditation. This badly misstates *Poindexter*. The language quoted by defendant—" ' "a factual matrix . . . distinct from 'ordinary' premeditated murder" ' "—refers not merely to the period of watchful waiting but to the entire suite of requirements for lying-in-wait, in particular concealment and a surprise attack. (*Id.* at p. 579.) In fact, *Poindexter* does not directly consider, let alone resolve, whether the period of time for watchful waiting must exceed that for deliberation and premeditation. The decision, however, appears implicitly to reject such an argument, since it notes, "The [Supreme] [C]ourt has held that jury instructions defining the required period of lying in wait, which indicate that it need not be for any particular length of time (so long as it is sufficient to demonstrate that defendant had a state of mind equivalent to premeditation or deliberation), sufficiently reflect the [*People v. Morales, supra,* 48 Cal.3d 527] requirement that the period of watching and waiting be for a 'substantial period.' " (*Id.* at p. 585.)[9]

Defendant also contends CALCRIM No. 728 is erroneous because it states that the period of time must be sufficient for "deliberation *or* premeditation," rather than "deliberation *and* premeditation." As a practical matter, those two processes ordinarily

_____

[9] In connection with this argument, defendant contends the prosecutor committed misconduct by misstating the law during closing argument when she told jurors premeditation and deliberation could be made in the time it takes to snap one's fingers. The argument was forfeited when no objection was made at trial (*People v. Collins* (2010) 49 Cal.4th 175, 226), and the failure to object fails to state a prima facie case of ineffective assistance because, given this record, defendant fails to demonstrate a reasonable probability of a more favorable disposition. (*People v. Homick* (2012) 55 Cal.4th 816, 893, fn. 44.)

11

occur in tandem, and there is no discernible difference in the time period for one or the other. As a means of measuring a "substantial" period of time, however, either is an adequate standard. As noted above, what is required is a not insubstantial period of time, which can be adequately measured either by the time necessary for deliberation or the period necessary for premeditation, assuming the two are in fact different.

### C. Right To Notice.

Defendant contends he was denied his constitutional "right to notice of the behavior which could violate a criminal statute" because, on the facts of this case, "there was no way to distinguish between the behavior which constituted first degree murder under a lying-in-wait theory and the behavior which violated the lying-in-wait special circumstance."

The "right to notice" is concerned with vagueness in criminal statutes. As the Supreme Court explained in *Maynard v. Cartwright* (1988) 486 U.S. 356, "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk. . . . Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with . . . open-ended discretion . . . ." (*Id.* at pp. 361–362.) Defendant points to nothing in the relevant statute, case law, or jury instructions that created uncertainty in these circumstances as to the applicability of the lying-in-wait special circumstance.

Rather, as defendant acknowledges, his argument is an attempt to recast the debate in *Bradway, supra,* 105 Cal.App.4th 297, regarding the sufficiency of the distinction between the lying-in-wait special circumstance and first degree murder on a theory of lying-in-wait. As the majority in *Bradway* held, the two are distinct because the special circumstance requires specific intent to kill, while first degree murder by lying-in-wait does not. (*Id.* at pp. 309–310.) The dissenting justice found this to be a distinction without a difference. (*Id.* at p. 313 (dis. opn. of McDonald, J.) For the reasons stated by

12

the majority in *Bradway*, at pp. 309–310, we agree that this distinction is sufficient to overcome Eighth Amendment objections.

### D. Admission Of Rebuttal Evidence.

In its case-in-chief, the prosecution called one of defendant's sisters, Delia Mendoza. She said she received a call on the day of the killing from defendant's wife, who told her defendant was with a woman and "might do something." Mendoza then called defendant, who said he had "hurt" Campued, to which Mendoza responded, "Don't touch that woman." Mendoza denied being told by defendant's wife that he had killed Campued, and she denied being frightened by her conversations with defendant that day, although she acknowledged thinking about another "Filipino," who was otherwise not identified or discussed.

In its rebuttal case, the prosecution recalled a detective who was involved in the murder investigation. The detective was allowed to testify about a conversation with Mendoza and defendant's wife that occurred before defendant was taken into custody on the day of the killing. The detective said both were "in a panic" and "afraid" of defendant because they believed he had killed Campued. After speaking with defendant, Mendoza told him, she had rushed out of the house to take the defendant's children from school, concerned for their safety. As far as the two knew, defendant "was out driving around, and they were afraid that they would encounter him." Over an objection, the detective was permitted to testify that Mendoza repeated the name "Valdemoro," a man of Filipino descent who, just a few weeks earlier, had killed five people in the same general area. Because they were also of Philippine background, the officer testified, defendant's family was well aware of Valdemoro's alleged crimes. As the detective testified, Valdemoro had "gone crazy," and Mendoza was "afraid that her brother had done the same thing."

Defendant contends the trial court erred in permitting the detective's hearsay testimony that Mendoza was concerned defendant had committed acts similar to those of Valdemoro.

13

We decline to address the merits of this argument because we conclude the admission of this evidence was harmless under the standard of *People v. Watson* (1956) 46 Cal.2d 818, which allows reversal for evidentiary error only if it is reasonably probable a different outcome would have resulted in the absence of the error. (*Id.* at p. 836.) There was substantial direct and circumstantial testimony about the circumstances of the killing, most of it undisputed. Because defendant testified, the jury was able to evaluate his demeanor and credibility. In light of his testimony, the only truly disputed issue was his deliberation and planning, or lack thereof, an issue largely dependent on the events occurring prior to the beating.

The testimony to which defendant objects was entirely peripheral to this central issue. In light of the context of Mendoza's conversation with the officer, the evidence related only to the degree to which Mendoza and defendant's wife were alarmed by their post-beating telephone calls with defendant. Despite the mention of Valdemoro, there was no suggestion that either witness believed defendant was capable of mass murder prior to what must have been their very disturbing telephone calls with him. Yet given defendant's extraordinary confessions, it is hardly surprising that both women worried that defendant had utterly lost his senses, in a manner that made him capable of further violence. There is no reason to believe testimony about their extreme but understandable reactions to his post-killing telephone calls materially influenced the jury's decision on the central disputed issue of defendant's deliberation.

DISPOSITION

The judgment of the trial court is affirmed.

14

 

 

_____
Becton, J.[*]


We concur:


_____
Margulies, Acting P.J.


_____
Banke, J.

[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15